Laura Carter Higley, Justice
Michael Lynch[1] appeals from a final default divorce decree, dissolving his marriage to Donna Falcon Lynch. In 16 issues, Michael challenges the provisions in the divorce decree that divide the marital estate, award Donna appellate attorney's fees, require Michael to pay federal income tax liabilities, and order the parties to defend and indemnify each other concerning outstanding liabilities. Michael also contends that the trial court abused its discretion in denying his motion to set aside the default judgment and motion for new trial.
Because Michael has met his burden to show that the trial court abused its discretion in awarding appellate attorney's fees to Donna and to show that the court erred in ordering the parties to indemnify one another, but he has not shown error in the remainder of the judgment, we (1) reverse the portion of the decree awarding appellate attorney's fees to Donna and remand for a new hearing on attorney's fees, (2) delete the portion of the decree ordering defense and indemnification, and (3) affirm the remainder of the judgment as modified.
Background
Michael and Donna were married in 1988. They did not have children during the marriage. Donna already had two children, a son and a daughter, when she married Michael.
After 27 years of marriage, Michael and Donna separated in March 2015. Michael moved out of the couple's house in Houston and into his own apartment.
In February 2016, Donna filed a petition for divorce and a request for temporary restraining orders. Among the grounds for the divorce, Donna claimed that Michael was "guilty of cruel treatment" toward her and that he had committed adultery. Donna asserted that she should be awarded a disproportionate share of the marital estate for a number of reasons, including "fault in the breakup of the marriage," "disparity of earning power of the spouses," "education and future employability of the spouses," "ages of the spouses," and "wasting of community assets." Donna also *113 requested that she be awarded her attorney's fees, including appellate attorney's fees.
On February 18, 2016, a licensed process server served Michael with the divorce petition and the request for temporary orders. A hearing was held on the temporary orders on March 2, 2016. Although he had been served notice of the hearing, Michael did not attend. Donna testified at the hearing and presented documentary evidence. She offered evidence showing that Michael had earned $639,000 in 2014, and she testified that she believed his pay had increased in 2015. Donna stated that Michael had refused to give her any money for the previous six months, and she had been paying her expenses with credit cards.
She also indicated that the couple owned a home in Houston and a home in Pittsburgh. Donna testified that there were outstanding property taxes on the Houston home that Michael had not paid. Donna requested the trial court to order Michael to pay her $25,000 per month in spousal support to cover the expenses for their two homes. She also requested the trial court to order Michael to pay the outstanding property taxes on the Houston home and to pay the credit card debt she had incurred to cover her living expenses for the preceding six months.
On March 15, 2016, the trial court signed temporary orders, requiring Michael to pay Donna $25,000 per month in spousal support and ordering him to pay various debts, including credit card balances and various property taxes owed on the couple's Houston home. The trial court also required Michael's employer to withhold income from Michael's paycheck to satisfy the spousal support.
On March 28, 2016, Donna filed a Petition for Enforcement of Temporary Orders by Contempt. In the enforcement petition, Donna claimed that Michael had violated the temporary orders because he had not paid the various credit card debts and property taxes he had been required to pay in the orders. A hearing was scheduled on the motion for May 2, 2016. A licensed process server served Michael with a copy of the enforcement petition and with notice of the hearing on April 8, 2016.
Michael did not file an answer to the divorce petition or otherwise appear in the suit. On April 22, 2016, the trial court conducted a trial in Michael's absence.
Donna offered into evidence her inventory and appraisement in which she itemized the community estate, providing values for the itemized property and listing the community estate's debts and liabilities. However, the inventory indicated that the values for several financial and retirement accounts identified in the inventory were unknown. The bottom of the inventory stated that the net value of the community estate was $3,367,208.
Under the heading "miscellaneous assets," Donna indicated that Michael owed her money because he had failed to comply with the temporary orders, which had required him to pay spousal support and to pay outstanding credit card and tax liabilities. Based on his noncompliance with the temporary orders, Donna indicated in the inventory that Michael owed her $29,728 for spousal support and $82,248 for the credit card and tax liabilities.
In her inventory, Donna also recommended how the community estate should be divided. She proposed that Michael receive two motor vehicles listed in the inventory, worth a combined value of $30,000 and that she receive the remainder of the community estate. Because he owed her money for his noncompliance with the temporary orders, Donna proposed that the value of the community estate received by *114 Michael be-$81,975. This figure represented the $30,000 value of the motor vehicles, minus the amount of money he owed her pursuant to the temporary orders.
Donna testified at trial. She reaffirmed the itemized values for the community assets identified in the inventory. She also confirmed that the total value of the marital assets listed in the inventory was $3.367 million. However, she stated that she did not know the value of several financial accounts held by Michael. And she stated that she believed there were other community assets of which she was not aware, raising the total value of the marital estate to $5 million.
Donna further testified that Michael, who has a college degree in chemical engineering, worked as a manager at an energy company and had earned $700,000 in 2014. Donna testified that she had not been employed during their 28-year marriage. She agreed that Michael, who was 56 years old, had "some years left to work and make a lot more money" and that she was "not going to have the benefit of [Michael's] income" after the divorce. Donna, who was 60 years old and without a college degree, indicated that she had been looking for work but was finding it difficult to enter the workforce at her age and skill level.
Donna further averred that Michael had used the community estate to support other women. Donna testified that, in October 2014, she found a hand-written note on her car at the couple's Houston home. The note, admitted into evidence, was signed by a woman named Lydia. It read as follows:
... Sugar Daddy-
Our arrangement was for $750.00 per week Money Me and my daughter rely on. You have to look At yourself every day and know what you did.
Your [sic] a dishonest man.
With no morals or values.
Donna was able to contact Lydia, and the two began texting one another. The text messages were admitted into evidence.
Through the texts, Donna learned that Lydia had met Michael through a website called "Seeking Arrangement." Lydia described the website as follows: "It is a website where you can find a sugar daddy to help you financially and in return you are his sugar baby. Your his gf [girlfriend] or mistress...." Lydia explained to Donna that she had a sugar baby-sugar daddy arrangement with Michael that had ended. As part of the arrangement, Lydia indicated that Michael had agreed to pay her $3,000 to $5,000 per month and a $750 per week allowance. Lydia told Donna that Michael had taken her to lunch and dinner numerous times and that she and Michael had sex three times: twice in Donna and Michael's home and a third time at a hotel.
Lydia told Donna that her arrangement with Michael had ended, but Michael still owed her $750 pursuant to the arrangement. Lydia explained that is why she went to the couple's home on the day she left the note found by Donna on the car.
Donna told Lydia that, in the past, she had gotten calls from other women who claimed that Michael owed them money. Donna stated that she did not realize until she corresponded with Lydia "what was going on." When she asked him about it, Michael had told Donna that he had no idea who the women were and had suggested that she call the police.
Lydia also forwarded Michael's profile from the Seeking Arrangement website to Donna. The profile indicated that Michael joined the website in August 2014. Michael's profile stated that his net worth was $5 million. The profile described Michael *115 as "a bona fide [sugar daddy]" who was "looking for one sweetheart for rendezvous to fine places, trysts and some travel." The profile, which Lydia forwarded to Donna in March or April 2015, indicated that Michael had been "active" on the website four days earlier. Lydia also told Donna that, when she logged on, she could see that Michael was still active on the website.
Donna also testified at trial that she had had found emails, from 2015, between Michael and another woman, Keira, with whom Michael appeared to be having an affair. The emails were admitted into evidence, and Donna testified about their content. In one email, Keira is seen in a photograph lying nude on a bed on a comforter that Donna testified belonged to Donna's daughter. Donna confirmed that the emails indicated that Michael was providing financial support to Keira. In the emails, Michael and Keira discussed money they had spent and trips they had taken to Maine and North Carolina for which Michael had paid. In addition, Donna testified that, after she and Michael had separated in March 2015, Keira began living with Michael. Donna confirmed that Michael was financially supporting Kiera with community funds.
Donna further testified that Michael had physically abused her during their marriage. She stated that a couple of times each year, throughout their entire 28-year marriage, Michael would pick her up and throw her against the wall or to the floor. One such instance occurred in 2012 while Donna and Michael were on a cruise. While on the ship, Michael picked Donna up and threw her. Donna hit her head, was knocked unconscious, and suffered a concussion. Donna offered records from the ship's medical doctor indicating the doctor's diagnosis was "assault," "minor head injury," and "hematoma left ankle." Donna testified that, as a result of the incident, Michael was asked to disembark from the ship at the next port. Donna also offered into evidence a photograph showing bruising on her upper arm, resulting from the incident on the ship.
Donna also testified that in March 2015 Michael again grabbed her and threw against the wall. She stated that she grabbed a gun from her closet but did not point it at Michael. Donna told Michael that he needed to leave, and he did. Michael moved out, and Donna and Michael separated.
Donna testified that, because of the abuse she suffered, she has been in counseling since 2012. She confirmed that she anticipates requiring counseling for many years to come due to the abuse.
With regard to the property division, Donna informed the trial court that she agreed to pay the community indebtedness that Michael had been ordered to pay in the temporary orders but had failed to pay. Specifically, she agreed to the pay the credit card debt and the outstanding property tax liabilities that Michael had been required to pay in the temporary orders. Concomitantly, Donna requested the trial court to award her a money judgment for $82,248, which was the amount of the credit card debt and property taxes that Michael had failed to pay as ordered in the trial court's temporary orders. Donna also asked the trial court to award $29,728 to her in the judgment for the spousal maintenance that Michael was ordered to pay in the temporary orders but did not pay.
In addition, Donna requested the trial court to sign a decree awarding her a disproportionate share of the community estate based on her inventory, which provided that she be awarded all the community estate, except for two motor vehicles worth a total of $30,000 and a bank account with an unknown amount of funds.
*116 Donna told the trial court that she believed she was entitled to a disproportionate share of the marital estate for a number of reasons, including the disparity in the earning power between her and Michael, her age, her lack of separate property, the physical abuse she suffered throughout the marriage, and Michael's wasting of the community estate by spending community funds on other women.
Donna further requested that the trial court to award her the couple's home in Pittsburgh and all interest in a company, Freeport Services, LLC. Donna pointed out that the Pittsburgh home and the company were not listed in her inventory. In addition, Donna requested $10,000 for appellate attorney's fees. Lastly, with regard to income taxes, Donna requested that Michael be ordered to pay "all taxes owed by the parties through the end of 2015 tax year" and that each party be responsible for his and her own taxes for 2016.
At the end of the trial, the trial court stated as follows:
Based on the testimony presented to the Court, the Court grants the divorce on grounds of insupportability, cruelty and adultery. The court further finds as to family violence. The Court awards property as follows: The Court grants the first judgment of $82,248 of unpaid debt that's listed in the temporary orders as well as the judgment for $29,728 for unpaid spousal maintenance and going forward from today the Court will not give spousal maintenance. In regard to property, the Court awards the property as requested, finding it's a fair and equitable division of the community estate based upon the facts and circumstances. We are not going to go through that or recite that again. The Court states that the property is awarded as set out in [Donna's inventory.]
The trial court further stated that it was awarding "the property interest that may or may not exist" in the house in Pittsburgh and in Freeport Services, LLC to Michael. The court ruled, "Husband ordered to be responsible for 100 percent of the tax liability [incurred] in 2015. Each party is responsible for 2016 taxes." The trial court ended the trial by awarding Donna $10,000 in appellate attorney's fees.
In conformance with its oral rendition, the trial court signed a final divorce decree on April 26, 2016, ordering the marriage between Michael and Donna dissolved on the grounds of adultery and cruelty. The trial court also found that Michael had committed family violence against Donna within the last two years.
With regard to its "just and right division of the parties' marital estate," the trial court awarded Michael (1) his household furnishings in his possession; (2) his clothing, jewelry, and personal effects; (3) funds in a Citizens Bank account, which Donna's inventory stated were "unknown"; and (4) two automobiles. In addition to her personal effects and household furnishings, the trial court's decree awarded Donna (1) the couple's Houston home; (2) funds in three bank accounts, (3) several retirement accounts; (4) a number of stock accounts; (5) two automobiles; and (6) several miscellaneous items, including the content of two storage lockers, a horse, and a cat. The trial court further ordered Michael to pay to Donna (1) $29,728 "for spousal support owed to her under the Temporary Orders" and (2) $82,250 "for monies owed to her under the Temporary Orders for payment of credit card debt and debt owed for taxes for [the Houston home]."
With respect to debts, Donna was ordered to pay the mortgage on the Houston home, tax liabilities on the home, and the outstanding credit card debt on the accounts that Michael had been ordered to *117 pay in the temporary orders. The trial court ordered Michael to "pay, as a part of the division of the estate of the parties, and shall indemnify and hold the wife and her property harmless from any failure to so discharge" (1) debts incurred by Michael after the couple's separation on March 15, 2015 and (2) obligations under the lease agreement for the apartment in which he was residing after the separation.
The trial court also ordered Michael to be "solely responsible for all federal income tax liabilities of the parties from the date of marriage through December 31, 2015[.]" The trial court ordered that each party be responsible for his and her own taxes for 2016, the year of the divorce. The decree also ordered the parties in a separate provision to defend and indemnify one another from claims or lawsuits brought against a spouse for the other spouse's debts, obligations, and liabilities.
The trial court did not award Donna her attorney's fees incurred in the trial court; however, it did award Donna $10,000 for attorney's fees on appeal, contingent on Michael being unsuccessful on appeal. Findings of fact and conclusions of law were neither requested nor filed for the default divorce decree.
On May 22, 2016, Michael filed a "Motion to Set Aside the Default Judgment and Motion for New Trial." Michael supported his motion with his affidavit, which contained the same factual information and assertions stated in his motions.
Michael asserted that his failure to file an answer before "judgment was the result of accident and mistake" and was not the result of his "intentional or conscious indifference." The motion explained Michael's failure to file an answer as follows:
Francis Michael Lynch believed, although mistakenly, that the papers he received back in February were only informal or informational copies. A lady had called him to pick up papers that he assumed were divorce papers. He met the lady at her minivan and she handed him the papers through her window. The lady was not wearing a uniform, but instead looked like an office assistant. The lady did not require a signature confirming receipt. Francis Michael Lynch read only enough of the papers to realize two things: (a) his wife was starting the divorce process after about a year of being separated; and (b) a Google search of his wife's lawyer indicated that her firm appeared to have a good reputation.
Michael then explained that, in the mid-1980s, he had been involved in a family law suit in Louisiana. In that suit, he had first received "an informal copy of the [suit] papers," and then later had received "a formal copy by a person in uniform from the sheriff's office," who had required him to sign for the papers. He averred in his affidavit, "Only then was I required to do anything to contest the case, which I did by hiring a lawyer." He explained that he thought he knew from that experience, and "from legal advice from my lawyer" in that case, that he "had the right to be served with formal notice of the lawsuit by a sheriff, constable or police officer." He stated that he thought suit was not "formally" initiated until he was served by a law enforcement officer. He also believed from that experience that he "would receive advance notice of any trial date."
Michael also explained that he had "dealt with legal issues in Pennsylvania between 1999 and 2010." He "recall[ed] all legal dealings and documents in Pennsylvania were submitted by certified mail and required a signature, something that did not happen with what he thought were the informal or informational divorce papers delivered to him here." He pointed out that he was not required to sign for the *118 papers that he received in this suit, which further led him to believe that the papers he received were "informal or informational divorce papers."
Michael claimed that it was because of his past experiences that he "treated the divorce papers as only informal notice" and "failed to act and failed to seek advice of counsel sooner in this divorce." In his affidavit, Michael stated that it was only after learning of the default divorce decree that he discovered that in Texas "process servers, who look like civilians, may serve formal lawsuit papers just like a sheriff or constable."
Michael also discussed the service of the petition to enforce the temporary orders by contempt, which occurred on April 8, 2016. He stated that a "person that looked like a private citizen delivered these papers. This person was wearing a t-shirt, shorts, and tennis shoes and was driving a private pickup truck. The person was not in uniform and did not ask [him] to sign anything." Michael also stated that he "did not read the papers because, again, he thought he was only being given a copy informally" but he "knows now that the papers related to temporary orders and enforcement of temporary orders."
Michael also claimed that he had "a meritorious defense" to the suit because the court's property division in the decree was "manifestly unjust." Michael asserted that the grounds supporting the trial court's dissolution of the marriage, including the family-violence finding, were "wrong." Michael also challenged Donna's inventory and appraisement. He asserted that she had not given correct values for some items listed in the inventory and that she had mischaracterized certain property as community property that was Michael's separate property. In the motion, Michael also averred, "A new trial in this case will neither occasion delay nor prejudice [Donna] because [Michael] is ready for trial and is willing to reimburse [Michael] for reasonable costs and expenses incurred in obtaining the default judgment."
On June 23, 2016, the trial court conducted a hearing on Michael's Motion to Set Aside Default Judgment and Motion for New Trial. At the hearing, Michael testified that, when he was sued in Louisiana in the 1980s, he had first received an "informal copy" of the suit papers in the mail. After receiving the informal copy, Michael had had been formally served with the suit papers in the Louisiana case by a sheriff's deputy who Michael said wore "a flat brim hat and full uniform." Michael said the process of being served by the sheriff's deputy had been "very formal." He described the process in more detailed as follows: "[The deputy] gave me a business card, advised me that there was a court date, upcoming court date involved. I had to sign. On his business card he suggested I call him if I had any questions. It was pretty clear there was something that was going to happen." Michael testified that, after being served by the deputy, he had hired an attorney and answered the Louisiana suit.
Michael recalled being served in this suit on February 18, 2016. He testified that, at the time of service, he believed that he was not being formally served; instead, he had believed, at that time, that he was receiving an informational copy of the suit papers. He had thought that he would be formally served with the divorce suit by a uniformed officer at a later date, as he had been in the Louisiana suit. Michael testified as follows with regard to what occurred when he was served in this case:
A woman called me in advance saying she had papers for me, and she asked if it would be okay to meet her in front of my [work] building. And when she arrived *119 -it might have been that same day or the next day-I met her downstairs. I remember leaving my office. I grabbed my pen so I could be able to sign because I thought they might be divorce papers. So, I went to meet her right in the parking lot. She never got out of her vehicle. She was just driving a minivan. She happened to be dressed in a floral print. It was clearly not a uniformed officer. And she handed me the papers. I reached for my pen to sign; and she said, "No. There is no need to sign." And that was it. The whole exchange took 10 seconds, perhaps; and she said that was it.
Michael testified that, based on his experience in Louisiana, he believed that the suit papers he received were an "informational copy." He acknowledged that he now knows that "a private process server can ... serve you the official copy just like a sheriff or constable," but he claimed that he did not know that before the default judgment was rendered in this case.
On cross-examination, Michael testified that he did not recall whether the process server, who served him with the suit papers, told him her name or identified herself as a licensed processor server; however, when asked if she had informed him of the date of the hearing on the temporary orders, Michael responded, "She did not."
Michael acknowledged that, in the Louisiana case, he had received the informational copy of the suit papers in the mail, in contrast to this case in which he was served with what he had thought was an informational copy in person by the licensed process server. Michael testified that, [b]y the level of informality of ... a woman in minivan [giving him the papers], it just felt like it was not service."
Michael also testified regarding what he did with the original divorce petition after he was served. He stated he brought it home and put it on his kitchen counter. He continued, "I was waiting for the official service to be filed; so, I kept it. And eventually I think it got-believe it got mixed in with other mail, newspapers. And I cannot locate the document now."
Michael acknowledged that the first page of the suit papers he was served was the citation. In his affidavit supporting his motion for new trial, he stated, "I recall having read only the first couple of pages of the divorce petition itself, not the 'Citation.' " At the hearing, Michael acknowledged that the citation, which was the first page of the documents her received, warned that a default judgment could be taken against him if he did not file a timely answer. Michael claimed that he had not read the citation, believing it to be a "cover letter of sorts." He said that he flipped the pages, proceeding directly to the divorce petition. Michael was asked, "How can you be certain, sir, that you didn't read that language [regarding the default judgment] that I just told you was on the thing called a citation?" Michael responded, "Because if I had read that, I would have been on the phone with you [his attorney] the next business day."
Michael also acknowledged that he had been served with the Petition for Enforcement of Temporary Orders by Contempt. The enforcement petition was also accompanied by a citation and a hearing notice.
With regard to service of the enforcement petition, Michael stated that a man, driving a white truck and dressed in shorts, had come to his home. Michael testified that, at the time, he thought that the man was "a tradesman that was going to approach me about soliciting for work." He said that the man asked him his name and handed him the enforcement papers. Michael claimed that he did not read the papers completely, including the notice of *120 the enforcement hearing. In his affidavit, Michael had stated that he had not read the enforcement papers because he was "extremely busy at work" and because he "was about to leave on a personal trip to Italy scheduled for April 15-30." When asked at the hearing, Michael stated that he did not come to court on the date of the enforcement hearing because he was waiting "for the official service" of the divorce suit by a uniformed officer.
Donna pointed to evidence showing that her attorney had emailed a copy of the temporary orders to Michael at this personal email address. Michael acknowledged that the email was received in the inbox of one of his personal email accounts; however, he testified that he used that email account infrequently and had not read the email. He offered a screenshot of the inbox of the account showing that the email sent by Donna's attorney had not been opened.
Michael further acknowledged that funds had been withheld from his paycheck to satisfy the temporary order that had awarded spousal support to Donna. Michael's wage-earning statement from his employer dated March 25, 2016, indicated that $3,885.84 had been withheld from his paycheck to satisfy the past-due spousal support payment. Michael claimed that he had not noticed the deduction because he had received a $120,000 bonus on that pay check.
Michael also testified that he believed the property division was "extremely unjust" and unfair because "it's 101 percent to my wife and minus 1 percent to me." Michael further asserted that Donna had not included items of value in her inventory that were part of the marital estate and had improperly included items that were Michael's separate property.
At the hearing, Donna presented the testimony of one witness: Anne Barthlow, the licensed process server who served Michael on February 16, 2016, with the original petition and request for temporary orders. Barthlow testified that she first contacted Michael on the telephone and introduced herself "as Anne with Esquire Legal" and identified herself "as a licensed process server." She told Michael that she had court documents that she "needed to serve to him." Michael indicated to her that he would "be down in a few minutes [to meet her in front of his office building]."
Barthlow then testified as follows with regard to how she served Michael with the suit papers:
I pulled up in the circle drive [of the office building], and [Michael] came out [after] about four minutes and walked up to the window. I remained seated in my car, extended my right hand, and shook his hand and said, "Hi. My name is Anne. I'm with Esquire Legal. I'm a licensed process server. I have court documents to give to you." And I handed him the documents and told him that he would be due in the 310th court on March 2nd, 2016.
Barthlow stated that Michael then thanked her and walked back into his office building. She testified that she saw Michael look at the first page of the documents, which the record shows was the citation.
On cross-examination, Michael's attorney asked Barthlow why she identified herself as a licensed process server both on the phone and when she served the documents. Barthlow responded,
To identify myself. When someone is answering the phone, I want to make it clear who I am. And, then, once they walk up, that person still doesn't know, you know, who I am. They have not met me before. So, it's standard practice. You have to identify yourself and who *121 you're with and that you are a licensed process server.
At the end of the hearing, the trial court denied Michael's motions for new trial and to set aside the default judgment. Michael did not request, nor did the trial court file, findings of fact and conclusions of law regarding the denial of the motions.
This appeal followed. Michael presents 16 issues challenging the trial court's final divorce decree.
Setting Aside Default Divorce Decree and Granting New Trial
In issues 15 and 16, Michael contends that the trial court erred in refusing to set aside its default judgment and grant a new trial.
A. Standard of Review & Applicable Law
When a default judgment is attacked by a motion for new trial, the critical question is: "Why did the defendant not appear?" Sutherland v. Spencer , 376 S.W.3d 752, 755 (Tex. 2012) (quoting Fid. & Guar. Ins. Co. v. Drewery Constr. Co. , 186 S.W.3d 571, 574 (Tex. 2006) ). We review a trial court's decision to overrule a motion to set aside a default judgment and grant a new trial for abuse of discretion. Dolgencorp of Tex., Inc. v. Lerma , 288 S.W.3d 922, 926 (Tex. 2009). The Supreme Court of Texas established the standard for setting aside a default judgment in Craddock v. Sunshine Bus Lines, Inc. , 133 S.W.2d 124, 126 (Tex. 1939). Under the Craddock test, post-answer as well as no-answer default judgments should be vacated and a new trial granted when the defaulting party establishes that (1) the failure to answer or to appear was not intentional, or the result of conscious indifference, but was due to a mistake or an accident; (2) the motion for a new trial sets up a meritorious defense; and (3) granting a new trial will not occasion delay or work other injury to the prevailing party. In re R.R. , 209 S.W.3d 112, 115 (Tex. 2006) ; Craddock , 133 S.W.2d at 126. When a defaulting party meets all three Craddock -test elements, a trial court abuses its discretion if it fails to grant a new trial. Dolgencorp , 288 S.W.3d at 926 ; Old Republic Ins. Co. v. Scott , 873 S.W.2d 381, 382 (Tex. 1994). When as here, no findings of fact and conclusions of law are filed, the denial of motions to set aside the default judgment and for new trial must be upheld on any legal theory supported by the evidence. See Strackbein v. Prewitt , 671 S.W.2d 37, 38 (Tex. 1984).
B. Analysis
Because it is dispositive, we address only whether Michael met the first element of the Craddock test; that is, whether he proved that his failure to file an answer was not intentional or the result of his conscious indifference. See Craddock , 133 S.W.2d at 126. Failing to file an answer intentionally or due to conscious indifference means "the defendant knew it was sued but did not care." Drewery Constr. , 186 S.W.3d at 576.
In determining whether he showed that his failure to answer or appear was not due to his intentional disregard or conscious indifference, we look to Michael's knowledge and his acts. See Dir.,State Emp. Workers' Comp. Div. v. Evans , 889 S.W.2d 266, 269 (Tex. 1994). "The absence of an intentional failure to answer rather than a real excuse for not answering is the controlling fact." Milestone Operating, Inc. v. ExxonMobil Corp. , 388 S.W.3d 307, 310 (Tex. 2012) (citing Craddock , 133 S.W.2d at 125 ). A defendant's excuse for failing to answer or appear "need not be a good one to suffice." Id.
*122 A defendant satisfies his burden under the first Craddock element when his factual assertions, if true, negate intentional or consciously indifferent conduct by him and the factual assertions are not controverted by the plaintiff. Sutherland , 376 S.W.3d at 755. However, "when the trial court conducts an evidentiary hearing on a motion for new trial and the party that obtained the default judgment presents controverting evidence at the hearing to show that the defaulted party acted intentionally or with conscious disregard to his rights, the question of why the defaulted party failed to answer presents a question of fact, which is resolved by the factfinder." Pekar v. Pekar , No. 09-14-00464-CV, 2016 WL 240761, at *3 (Tex. App.-Beaumont Jan. 21, 2016, no pet.) (mem. op.) (citing Utz v. McKenzie , 397 S.W.3d 273, 278 (Tex. App.-Dallas 2013, no pet.) ; Freeman v. Pevehouse , 79 S.W.3d 637, 641 (Tex. App.-Waco 2002, no pet.) ). In that event, the trial court, as factfinder, may generally believe all, none, or part of a witness's testimony. Id. (citing Utz , 397 S.W.3d at 279 ). At that point, "[a] trial court can reasonably believe, based on contradictory evidence, that there was intentional or consciously indifferent conduct on the part of a defendant." Rodriguez v. Medders , No. 10-11-00369-CV, 2012 WL 4862588, at *3 (Tex. App.-Waco Oct. 4, 2012, no pet.) (mem. op.) (citing Freeman , 79 S.W.3d at 647) (in turn citing K-Mart Corp. v. Armstrong , 944 S.W.2d 59, 62 (Tex. App.-Amarillo 1997, writ denied)), and Baker v. Kunzman , 873 S.W.2d 753 (Tex. App.-Tyler 1994, writ denied) ).
In the trial court, Michael acknowledged that he had been served with the divorce papers, including the motion for temporary orders. Cf. Milestone Operating , 388 S.W.3d at 310 (holding that defendant satisfied first Craddock element because its registered agent testified that he did not recall being served, even though evidence showed he had been served, and plaintiff did not controvert the testimony). Nonetheless, in his affidavit and in his testimony, Michael stated that, based on his experience in the Louisiana lawsuit in the mid-1980s, he mistakenly believed he was not required to answer the instant lawsuit until he was served with the "formal" suit papers by a law enforcement officer wearing a uniform. He testified in his affidavit that he thought the process server, Barthlow, was "an administrative assistant," who, driving a minivan and not wearing a uniform, was delivering informational copies of the suit papers to him. He stated in his affidavit, "I thought I had to be served by a sheriff, constable or police officer to formally start a divorce [suit]." Michael asserts that his sworn belief that he did not need to answer until he was served by a uniformed peace officer-based on his past experience in the Louisiana suit-negated any determination that his failure to answer was intentional or the result of consciously indifference conduct but instead, when taken as true, showed that his failure to answer was the result of a mistake of law. See Bank One Tex., N.A. v. Moody , 830 S.W.2d 81, 84 (Tex. 1992) (holding that defendant bank did not act with intent or conscious indifference because it believed that freezing accounts and tendering the balance of the accounts to clerk issuing the writ was sufficient response to suit); Angelo v. Champion Rest. Equip. Co. , 713 S.W.2d 96, 97 (Tex. 1986) (holding that defendant's belief that paying underlying claim was sufficient answer, negated intent or conscious indifference).
Michael likens this case to In re R.R. , a termination-of-parental-rights case. 209 S.W.3d at 116. There, the defendant mother was served with the termination suit but did not answer or otherwise appear *123 before a default judgment was rendered terminating her parental rights. Id. at 114.
The mother then filed a motion for new trial, challenging the default judgment based on Craddock . See ids="8442434" index="30" url="https://cite.case.law/sw3d/209/112/#p115">id. She asserted that she had not answered the suit, not only because she did she not understand the suit papers, but because she had believed she would be appointed counsel to represent her. See id. She had formed this belief based on an earlier criminal case in which she had been appointed counsel and based on the representations of her CPS caseworker, who had indicated that the mother would "get an attorney" to represent her in the termination suit. See ids="8442434" index="32" url="https://cite.case.law/sw3d/209/112/#p115">id. The evidence also showed that, during the pendency of the termination case, the mother had maintained contact with her CPS caseworker and with her children. See ids="8442434" index="33" url="https://cite.case.law/sw3d/209/112/#p115">id.
With regard to whether the mother had acted with conscious indifference, the In re R.R. court held,
[The mother's] affidavit and testimony were not to the effect that her failure to file an answer was only because she lacked an understanding of the citation. They were to the effect that based on her prior experiences with the court system and her contacts with CPS, she believed no action on her part was necessary for her interests to be protected and for an attorney to be appointed for her without further action on her part. Those experiences and [the mother's] stated beliefs based on those experiences, together with the uncontroverted facts as to actions [the mother] took-staying in regular contact with the caseworker about the progress of the case, writing her children, inquiring regularly about the children-when taken as true, negate the element of conscious indifference to proceedings designed to terminate the parent-child relationship between [the mother] and her children.
Id. at 115 (citing Evans , 889 S.W.2d at 269 ).
Michael asserts this is case is similar to In re R.R. because he, like the mother in that case, did not appear in the suit based on an experience in an earlier case. However, this is where the similarity between the two cases ends. In In re R.R. , the evidence showed that the mother had reason to maintain her belief, throughout the pendency of the termination suit, that she would be appointed counsel to represent her just as she had been appointed counsel in an earlier criminal case. Specifically, the mother's belief was reinforced by her caseworker's representation that she was entitled to counsel. See id. at 114.
Here, Michael averred in his affidavit and in his testimony that he also maintained his belief, during the pendency of the case, that the divorce action had not been initiated against him because he had not been formally served by a uniformed peace officer; thus, he was not required to answer or appear in the suit. Michael indicated that nothing occurred before the rendition of the default judgment to dispel his belief that the suit had not been formally initiated, and therefore he did not need to act. He pointed out that Barthlow did not provide him with a business card, and she conducted herself in an informal manner. He also pointed out that the process server who served him with the enforcement petition was also not a peace officer. Michael further pointed out that Donna's attorney never called him to inform him that suit had been filed.
In determining if Michael's factual assertions are controverted, we look to all the evidence in the record. See Evans , 889 S.W.2d at 269. At the hearing, Donna offered controverting evidence from which the trial court, as the fact finder, could *124 have reasonably inferred that Michael knew that the Donna had initiated suit against him and that he was required to take action, responding to the suit. In contrast to Michael's testimony describing how informal his interaction with Barthlow was when she served him, Barthlow provided testimony showing that there was a level of formality to the interaction and that she made statements to him indicating that suit had been formally initiated against him. Not only did Barthlow indicate that she had identified herself twice to Michael-once on the phone and once in person-as a licensed process server, she also testified that she told Michael that she had court documents that she "needed to serve to him." While Michael testified that his interaction with Barthlow was only about 10 seconds, Barthlow testified that her exchange with Michael was "closer to a full minute."
Most significantly, Barthlow testified, "I handed him the documents and told him that he would be due in the 310th court on March 2nd, 2016," which was the hearing on the temporary orders. In his testimony, Michael stated that the sheriff's deputy, who had served him in the Louisiana suit, had "advised me that there was a court date, upcoming court date involved." Michael had mentioned this detail as an indicia of formality that had alerted him in the Louisiana suit that he was being served and that "there was something that was going to happen." He stated that he had then contacted his attorney in that suit.
When he was asked at the hearing whether Barthlow had informed him of the hearing date, Michael stated, "She did not." Despite Michael's denial, as the fact finder, the trial court was entitled to disbelieve Michael's testimony and to believe Barthlow when she testified that she informed Michael that he was due in court in two weeks on March 2. See Pekar , 2016 WL 240761, at *3. From this, the trial court could have reasonably inferred that there was a level of formality to the service. And the court could have reasonably inferred that Michael knew, when he was served, that suit had been initiated against him and that he was required to appear in court.
It was with the knowledge that he needed to appear at the March 2 hearing, then, that Michael chose not to read the citation served on him by Barthlow. The citation warned him that a default judgment could be taken against him if he did not answer. Barthlow indicated in her testimony that she saw Michael look at the citation when she gave it to him. Although Michael described it as a "cover letter of sorts," the citation-marked "CITATION"-had at its top the style of the case (identifying Michael as the "Defendant"), the court cause number, the name of the court in which the case had been filed, and a statement that the citation had been filed four days earlier "in the above cited cause number and court." After stating that the citation had been filed in court in the cited cause number in which Michael was a defendant, the citation read,
YOU HAVE BEEN SUED, You may employ an attorney. If you or your attorney do not file a written answer with the District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of 20 days after you were served this citation and petition, a default judgment may be taken against you.
When he was later served with the Petition for Enforcement by Contempt and accompanying citation on April 8, Michael had already failed to appear in court on March 2. The trial court could have reasonably inferred that Michael knew that he had failed to appear. The trial court could have also found that Michael, *125 who described himself as "a high-up executive at an energy company," knowing that he missed the March 2 hearing, chose not to read the enforcement petition and accompanying citation at his own peril. The citation accompanying the enforcement papers, like the citation that had accompanied the divorce petition, warned Michael that a default judgment could be taken against him if he did not answer. Michael acknowledged at the hearing that, had he read the language in the citation warning him of the default judgment, he would have immediately contacted his attorney.
In addition, Michael points out that Donna's attorney did not call him to inform him about the divorce proceedings. He relies on this as a reason why he did not discover that he had been formally sued and that needed to respond. However, Michael acknowledged that he had looked at the last page of the divorce petition at the time he was served in order to determine whether Donna had hired a reputable attorney. Michael testified in his affidavit that he had "Googled" the attorney's name and was pleased to see that Donna had hired a reputable lawyer. In so doing, Michael acknowledged that he knew that Donna had an attorney to represent her in the divorce, and he knew the attorney's name.
Michael also acknowledged that, attached to her response to his motion for new trial, Donna had offered an email sent by her attorney to Michael on March 18, 2016. Attachments to the email had informed Michael that temporary orders had been entered against him on March 15 and had forwarded a copy of the temporary orders. Michael acknowledged that the email had been sent to an account belonging to him; however, Michael claimed that he had never opened the email because it was an account that the used infrequently. Michael testified that, the night before the new trial hearing, he had looked at the email account's inbox and had, for the first time, discovered the email from Donna's attorney.
Michael testified that he had taken a screen shot of the inbox, and he offered it into evidence. The screenshot showed the email from Donna's attorney in bold letters, indicating that the email had not been opened. However, the screenshot also showed that a number of other emails had been sent to that email account around the same time that Donna's attorney had sent her email. These other emails included emails received on March 21, 2016 from an airline identifying the subject of the emails as airline reservations to Rome. There were also several emails regarding vacation rentals in Italy.[2] Another mid-March email had as its subject line: "Online Mortgage Payment Ready to View." And there were other emails in the inbox showing that the email account had been used, presumably by Michael, on March 16, 2016 to reset a password for an online-line municipal payment account.
Given the indications that Michael was actively using the email account at the time that Donna's attorney-whose name Michael had admittedly researched on the Internet-sent her email, the trial court, as the factfinder, could have disbelieved Michael's claims that he was not actively using the email account. Instead, the trial court could have believed either that Michael *126 had read the email when it was received and then marked it as unread before printing the screenshot of the inbox, or the trial court could have believed that Michael had recognized the attorney's name from the divorce petition and had purposefully chosen not to open the email. See Utz , 397 S.W.3d at 279 ("As the sole judge of the credibility of the witnesses and the weight to be given to their testimony, the trial court may choose to believe all, none, or part of a witness's testimony."); Rodriguez , 2012 WL 4862588, at *3 ("A trial court can reasonably believe, based on contradictory evidence, that there was intentional or consciously indifferent conduct on the part of a defendant.").
Finally, we are mindful that, in Walker v. Gutierrez , 111 S.W.3d 56, 63 (Tex. 2003), the Supreme Court of Texas recognized,
In Bank One, Texas, N.A. v. Moody , 830 S.W.2d 81, 84 (Tex. 1992), we held that a mistake of law is one of the excuses that may satisfy the Craddock requirements. We emphasized, however, that not every act of a defendant that could be characterized as a mistake of law is a sufficient excuse. 830 S.W.2d at 84. We cited three cases in which mistakes of law failed to meet the Craddock standard. Id. (citing Carey Crutcher, Inc. v. Mid-Coast Diesel Servs., Inc. , 725 S.W.2d 500, 502 (Tex. App.-Corpus Christi 1987, no writ) (attorney did not understand effect of bankruptcy stay), First Nat'l Bank of Bryan v. Peterson , 709 S.W.2d 276, 279 (Tex. App.-Houston [14th Dist.] 1986, writ ref'd n.r.e.) (in response to writ of garnishment, party froze accounts but did not submit funds to the court or file an answer), and Butler v. Dal Tex Mach. & Tool Co., Inc. , 627 S.W.2d 258, 260 (Tex. App.-Fort Worth 1982, no writ) (read but did not understand citation; did nothing)).
....
Two months after our holding in Bank One , we decided Holt Atherton Industries, Inc. v. Heine , 835 S.W.2d 80 (Tex. 1992). In that case, we held that Holt Atherton's uncontroverted affidavit that it did not file an answer because it did not possibly think it could be held liable was insufficient to negate a finding of conscious indifference. 835 S.W.2d at 83. We concluded that the trial court did not abuse its discretion in denying the motion to set aside the default judgment because the court could have concluded, based on the evidence before it, that Holt Atherton's failure to answer was intentional or due to conscious indifference. Id.
Walker , 111 S.W.3d at 63 (emphasis added); see also Padilla v. Hollerman Dev., L.P. , No. 04-08-00739-CV, 2009 WL 1153324, *4 (Tex. App.-San Antonio Apr. 29, 2009, no pet.) (mem. op.) (relying on supreme court's not-every-legal-excuse-is-a-sufficient-excuse principle and holding that it was not abuse of discretion for trial court to deny motion for new trial when defendant purposefully did not file answer based on his attorney's incorrect assessment that he had not been properly served and could wait until he was properly served to file his answer; indicating trial court could have properly determined this was not a sufficient mistake of law to satisfy Craddock ).
After reviewing the evidence of Michael's acts and of his knowledge, we conclude that the trial court could have reasonably found that Michael "knew [he] was sued but did not care." Sutherland , 376 S.W.3d at 755. In other words, the trial court could have determined that Michael acted with conscious indifference to the proceedings when he failed to answer the *127 suit, and as a result, did not meet the first Craddock element. See Craddock , 133 S.W.2d at 126 ; see also Evans , 889 S.W.2d at 269 (stating that courts look to knowledge and acts of defaulting party to determine whether failure to answer or appear was intentional or due to conscious indifference). Accordingly, we hold that the trial court did not abuse its discretion when it denied Michael's motions to set aside the default judgment and for new trial.
We overrule Michael's fifteenth and sixteenth issues.
Division of Marital Estate, including Federal Income Tax Liability
In his first through sixth issues, Michael challenges the division of the marital estate in the default divorce decree. In his ninth through twelfth issues, Michael specifically challenges the division of federal income tax liability.
A. Applicable Law and Standard of Review
We review a trial court's division of marital property for an abuse of discretion. See Barras v. Barras , 396 S.W.3d 154, 164 (Tex. App.-Houston [14th Dist.] 2013, pet. denied). The trial court has broad discretion when dividing the marital estate at divorce, and we must indulge every reasonable presumption in favor of the trial court's proper exercise of its discretion. Murff v. Murff , 615 S.W.2d 696, 698 (Tex. 1981). "To disturb a trial court's division of property, a party must show that the court clearly abused its discretion by a division or an order that is manifestly unjust or unfair." Barras , 396 S.W.3d at 164. A trial court abuses its discretion when it acts arbitrarily, unreasonably, or without any reference to guiding rules and principles. Worford v. Stamper , 801 S.W.2d 108, 109 (Tex. 1990).
Family Code section 6.701 provides as follows: "In a suit for divorce, the petition may not be taken as confessed if the respondent does not file an answer." TEX. FAM. CODE ANN. § 6.701 (West 2006). "Therefore, when the respondent fails to file an answer, the petitioner must adduce proof to support the material allegations in the petition." Colmenero v. Colmenero , No. 01-14-00071-CV, 2015 WL 1245849, at *2 (Tex. App.-Houston [1st Dist.] Mar. 17, 2015, no pet.) (mem. op.) (citing In re E.M.V. , 312 S.W.3d 288, 291 (Tex. App.-Dallas 2010, no pet.) ).
In family law cases, legal and factual sufficiency challenges do not constitute independent grounds for asserting error, however, they are relevant factors in determining whether the trial court abused its discretion. Colmenero , 2015 WL 1245849, at *2 (citing Beaumont Bank v. Buller , 806 S.W.2d 223, 226 (Tex. 1991) ; Moore v. Moore , 383 S.W.3d 190, 198 (Tex. App.-Dallas 2012, pet. denied) ). To determine whether a trial court abused its discretion because the evidence is legally or factually insufficient to support its decision, we consider whether the trial court (1) had sufficient evidence upon which to exercise its discretion and (2) erred in its application of that discretion. Id. (citing Moroch v. Collins , 174 S.W.3d 849, 857 (Tex. App.-Dallas 2005, pet. denied) ). We conduct the applicable sufficiency review when considering the first prong of the test. Id. We then determine whether, based on the evidence, the trial court made a reasonable decision. Id. If the division of marital property lacks sufficient evidence in the record to support it, then the trial court's division is an abuse of discretion. Id. (citing Wilson v. Wilson , 132 S.W.3d 533, 537 (Tex. App.-Houston [1st Dist.] 2004, pet. denied) ).
*128 B. Disproportionate Division of Marital Estate
Michael's first through sixth issues, as stated in the "Issues Presented section of his brief, complain that the trial court's "division of marital property in the default divorce decree" was (1) a result of the trial court's abuse of discretion; (2) "not a fair and equitable apportionment of the community estate"; (3) "manifestly unjust and unfair and grossly disproportionate"; (4) supported by "no evidence (or in the alternative, insufficient evidence)"; (5) supported by "no evidence (or in the alternative, insufficient evidence)" because the estate of the parties was not divided in a just and right manner; and (6) supported by "no evidence (or in the alternative, insufficient evidence)" when the property division was "manifestly unjust and unfair and grossly disproportionate."
Relevant to Michael's stated issues, Family Code section 7.001 requires the trial court to divide community property in a "just and right" manner. TEX. FAM. CODE ANN. § 7.001 (West 2006). However, mathematical precision in dividing property in a divorce is usually not possible. Murff , 615 S.W.2d at 700. Equal division of property is not required, but the division must be equitable. Marin v. Marin , No. 14-13-00749-CV, 2016 WL 1237847, at *2 (Tex. App.-Houston [14th Dist.] Mar. 29, 2016, no pet.) (mem. op.).
If the evidence demonstrates a reasonable basis for doing so, a trial court may order a disproportionate division of the community property. Murff , 615 S.W.2d at 698-99, & 698 n.1. As the Supreme Court of Texas recognized in Murff , various factors become relevant and may properly be considered in dividing the community-property estate under Family Code section 7.001. See ids="9977869" index="73" url="https://cite.case.law/sw2d/615/696/#p698">id. at 699. These non-exclusive Murff factors include the following: (1) the nature of the property; (2) the disparity of incomes or earning capacities; (3) the parties' business opportunities; (4) the parties' relative financial condition and obligations; (5) the parties' education and physical condition; (6) the disparity in ages; (7) fault in the break-up of the marriage; (8) the benefit the innocent spouse would have received had the marriage continued; (9) the size of any separate estates; and (10) the probable need for future support. See ids="9977869" index="74" url="https://cite.case.law/sw2d/615/696/#p698">id.
Murff confirmed that a trial court may, but need not, take fault into consideration when dividing an estate. Nowzaradan v. Nowzaradan , No. 01-05-00094-CV, 2007 WL 441709, at *7 (Tex. App.-Houston [1st Dist.] Feb. 8, 2007, no pet.) (mem. op.) (citing Murff , 615 S.W.2d at 698 ). Generally, in a fault-based divorce, such as here, the trial court may consider the conduct of the errant spouse when making a disproportionate distribution of the marital estate. See In re Marriage of C.A.S. , 405 S.W.3d 373, 384 (Tex. App.-Dallas 2013, no pet.). For instance, a trial court's finding of adultery and physical abuse can support the disproportionate division of the community property. See, e.g., In re K.R.C. , No. 05-13-01419-CV, 2015 WL 7731784, at *4 (Tex. App.-Dallas Dec. 1, 2015, pet. denied) (mem. op.) (affirming trial court's disproportionate division of community property that was based on adultery finding); Alsenz v. Alsenz , 101 S.W.3d 648, 655 (Tex. App.-Houston [1st Dist.] 2003, pet. denied) (considering evidence that husband verbally and physically abused wife in upholding disproportionate division of marital estate in favor of wife). The trial court may also consider that a spouse unfairly depleted or dissipated community assets. Nowzaradan , 2007 WL 441709, at *7.
Although his first through sixth issues listed in the "Issues Presented" section of *129 his brief are stated broadly, Michael offers a narrow argument in his brief to challenge the trial court's property division. Michael's argument in its entirety is as follows:
The final decree of divorce is not a fair and equitable apportionment of the community estate. In fact, under any circumstance, the award of virtually 100% of the community estate to Donna was manifestly unjust and unfair and grossly disproportionate and constitutes an abuse of discretion.
At the April 22, 2016 default judgment hearing, Donna testified that Michael has been cruel to her during the marriage. Donna also testified that Michael was having multiple affairs. Donna testified that Michael had spent community funds on the other woman but she didn't know the exact amount. Donna also testified regarding most of the Murff v. Murff factors. The Trial Court granted the divorce and, based upon Donna's inventory, awarded Donna $3,367,208.00 and awarded Michael -$81,976.00. Essentially Michael received nothing of value.
Even if all of the testimony at the default judgment hearing was true, it doesn't justify awarding 100% of the community estate to Donna. A division of property cannot be more grossly disproportionate than awarding 100% of the community estate to one of the spouses. In this situation, the award of 100% of the community estate to Donna was grossly disproportionate, and thus manifestly unjust and unfair and constituted an abuse of discretion.[3]
As seen by his argument, Michael asserts that awarding Donna 100% of the community estate per se makes the property division manifestly unjust and unfair, irrespective of Donna's evidence supporting a disproportionate division. Michael acknowledges that Donna offered (1) evidence relevant to the Murff factors,[4] (2)
*130 evidence showing that Michael committed adultery with women to whom he had provided financial support from community funds, and (3) evidence showing that Michael had committed family violence against Donna throughout their 28-year marriage. Nonetheless, Michael asserts that the amount of the award (that is, 100% of the community estate), rather than the record evidence, intrinsically makes the property division manifestly unjust and unfair. However, Michael offers no authority to support this assertion. To the contrary, courts have upheld divisions of a community estates in which one spouse receives 100% of the estate or receives a greatly disproportionate share of the estate based on evidence similar to Donna's evidence in this case. See, e.g., Taylor v. Taylor , No. 14-09-00012-CV, 2010 WL 2542549 (Tex. App.-Houston [14th Dist.] June 24, 2010, no pet.) (mem. op.) (upholding award to wife that husband characterized as being more than 100% of the community estate based on finding that husband had been at fault for divorce and consideration of Murff - factor evidence); In re K.N.C. , 276 S.W.3d 624, 630 (Tex. App.-Dallas 2008, no pet.) (affirming wife's award of 100% of community estate when evidence showed husband had used community assets for his own personal benefit for which wife derived no benefit); see also In re Svalesen , No. 05-13-01151-CV, 2015 WL 4456096, at *4 (Tex. App.-Dallas July 21, 2015, no pet.) (mem. op.) (affirming 83% award of community estate to wife based on finding by trial court of "history and pattern of family violence" by husband); Ohendalski v. Ohendalski , 203 S.W.3d 910, 914 (Tex. App.-Beaumont 2006, no pet.) (holding award to wife of 81% of community estate not abuse of discretion because evidence showed husband committed adultery and was abusive towards wife); Morrison v. Morrison , 713 S.W.2d 377, 379-80 (Tex. App.-Dallas 1986, writ dism'd) (determining award to wife of 83.5% of community estate not abuse of discretion in case in which husband committed adultery and misused funds).
In dividing the marital estate, the trial court has broad discretion, and we must presume that it exercised that discretion properly. Murff , 615 S.W.2d at 698-99. The party complaining of the division of the community estate has the burden of showing from the evidence in the record that the trial court's division of the community estate was so unjust and unfair as to constitute an abuse of discretion. See Mann v. Mann , 607 S.W.2d 243, 245 (Tex. 1980) ; Vannerson v. Vannerson , 857 S.W.2d 659, 672 (Tex. App.-Houston [1st Dist.] 1993, writ denied). Because Michael has not met his burden to show from the evidence that the trial court's division of the community estate was so unjust and unfair as to constitute an abuse of discretion, and because the evidence supports the trial court's award, we hold that the trial court properly exercised its discretion in dividing the community estate.
We overrule Michael's first through sixth issues.
*131 C. Federal Income Tax Liability
In his ninth through twelfth issues, Michael challenges provisions in the final divorce decree that govern the allocation of federal income tax liability between him and Donna.
1. Pre-2016 Federal Income Tax
In the decree, the trial court ordered as follows:
[Michael] shall be solely responsible for all federal income tax liabilities of the parties from the date of marriage through December 31, 2015, and shall timely pay any deficiencies, assessments, penalties, or interest due thereon and shall indemnify and hold [Donna] and her property harmless therefrom unless such additional tax, penalty, and/or interest resulted from [Donna's] omission of taxable income or claim of erroneous deductions. In such case, the portion of the tax, penalty, and/or interest relating to the omitted income or claims of erroneous deductions shall be paid by [Donna].
On appeal, in his ninth and tenth issues, Michael asserts that the trial court abused its discretion with respect to rendering this provision of the decree. He contends that Donna offered no evidence, or insufficient evidence, to support the trial court's order that he be responsible for "all federal income tax liabilities of the parties from the date of marriage through December 31, 2015."
As mentioned, a trial court has broad discretion in dividing the marital estate in a manner that the court deems just and right. See TEX. FAM. CODE ANN. § 7.001 ; Murff , 615 S.W.2d at 698. "Debts and liabilities incurred jointly by the parties, such as federal income tax liabilities, must be considered by the trial court in determining a just and right division of the community estate and must be apportioned to one or both of the spouses." Kemp v. Kemp , No. 11-11-00292-CV, 2013 WL 5891583, at *6 (Tex. App.-Eastland Oct. 31, 2013, no pet.) (mem. op.) (citing Bush v. Bush , 336 S.W.3d 722, 740 (Tex. App.-Houston [1st Dist.] 2010, no pet.) ); see also Shelton v. Shelton , No. 01-02-01009-CV, 2003 WL 22511463, at *4 (Tex. App.-Houston [1st Dist.] Nov. 6, 2003, no pet.) (mem. op.) ("It is well-settled that, although a tax liability is not technically a 'debt,' a trial court may, in a divorce case, take the parties' tax liability into consideration in its division of the marital estate, and may even require one party to assume the other's tax liability."). Courts have recognized that a trial court has the authority and the discretion to impose the entire tax liability of the parties on one spouse. See, e.g., Kemp , 2013 WL 5891583, at *6 ; In re S.A.A. , 279 S.W.3d 853, 857 (Tex. App.-Dallas 2009, no pet.) ; Shelton , 2003 WL 22511463, at *4.
At the default hearing, Donna requested that Michael be ordered to pay all the marital taxes. She confirmed that Michael "has a propensity to not pay taxes to the government and has had several tax liens." In addition, the trial court heard evidence that Donna was never employed during her 28-year marriage to Michael; Michael was the sole wage earner, making around $700,000 in 2014. The evidence showed that Michael had the potential to continue earning an income, while Donna was having difficulty obtaining employment. The evidence also showed that Michael had spent community assets on other women without Donna's permission during 2014 and 2015. And the evidence showed that Michael had physically abused Donna throughout their marriage. Given the evidence, it was within the trial court's discretion to order Michael to be liable for the couple's federal income-tax liabilities during their marriage through December 31, *132 2015. See Kemp , 2013 WL 5891583, at *6 ; In re S.A.A. , 279 S.W.3d at 857.
Moreover, Michael failed to demonstrate the imposition of tax liability on him adversely affected him with respect to the trial court's overall division of the community estate. "An appellate court should reverse a trial court's division of property only if the error materially affects the court's just and right division of the property." Kemp , 2013 WL 5891583, at *6 (citing Henry v. Henry , 48 S.W.3d 468, 480 (Tex. App.-Houston [14th Dist.] 2001, no pet.) (in turn relying on Jacobs v. Jacobs , 687 S.W.2d 731, 732-33 (Tex. 1985) ). Accordingly, even if the trial court erred by imposing federal income tax liability on him, Michael did not show that such error would require reversal of the trial court's decree. See ids="9983464" index="101" url="https://cite.case.law/sw2d/687/731/#p732">id. (affirming trial court's order in decree that husband bear tax liability, even though order was erroneous, because husband failed to show error materially affected just and right division of property).
We overrule Michael's ninth and tenth issues.
2. Federal Income-Tax for 2016
In his eleventh and twelfth issues, Michael complains of the following provision in the trial court's decree:
For the purposes of determining income tax liability, the parties agree and hereby partition 100 percent of the income, gain, loss, and deductions attributable to a party from that party's individual labor, that party's individual efforts, or the property awarded in this agreement to that party, as his or her sole and separate property, as if that party had been single and unmarried from January 1, 2016, through the date of divorce. The partition further assigns to a party any exemptions, exclusions, estimated tax payments, and withholdings made by that party or for his or her benefit from January 1, 2016, through the date of divorce, as if the same were that party's separate property. The parties agree and IT IS ORDERED AND DECREED that, for purposes of determining income tax liability, any property awarded to a party in this decree shall be deemed to be partitioned to that party and have been that party's separate property as of January 1, 2016, and thereafter. The parties further agree and IT IS ORDERED AND DECREED that any tax payments and any payments that are tax deductible are assigned to the party who made those payments.
At the default hearing, Donna requested that she "be responsible for her taxes for 2016," and "[Michael] be responsible for his." On appeal, Michael correctly points out that, contrary to the recitals in the decree, the record does not show that, for tax liability purposes, he and Donna agreed to partition property that would otherwise be treated as community property "as his or her sole and separate property ... from January 1, 2016, through the date of divorce." See Marriage of O'Brien , 436 S.W.3d 78, 81 (Tex. App.-Houston [14th Dist.] 2014, no pet.) (recognizing that assets earned during marriage, even during pendency of divorce proceedings, are community property). Nor did Michael and Donna agree "that any tax payments and any payments that are tax deductible are assigned to the party who made those payments." In addition, no other evidence in the record supports the trial court's decision to characterize community party as separate property for purposes of 2016 tax liability.
However, regardless of whether the trial court erred in mischaracterizing the evidence for this purpose, Michael's argument fails. To prevail on a *133 mischaracterization challenge, Michael must establish, not only that the trial court erred, but that this error caused sufficient harm to constitute an abuse of discretion. See Haining v. Haining , No. 01-08-00091-CV, 2010 WL 1240752, at *11 (Tex. App.-Houston [1st Dist.] Mar. 25, 2010, pet. denied) (mem. op.) (holding appellant must show that he was harmed by mischaracterization of community property); Magill v. Magill , 816 S.W.2d 530, 533-34 (Tex. App.-Houston [1st Dist.] 1991, writ denied) (holding appellant must demonstrate that division of property is manifestly unjust and that mischaracterization of his separate property created an inequality). "Mischaracterization of community property as separate property is harmful and requires reversal only if the mischaracterization affects the just and right division of the community estate." In re Marriage of McNelly , No. 14-13-00281-CV, 2014 WL 2039855, at *7 (Tex. App.-Houston [14th Dist.] May 15, 2014, pet. denied) (mem. op.) (citing Boyd v. Boyd , 131 S.W.3d 605, 617 (Tex. App.-Fort Worth 2004, no pet.) ). We need not reverse the trial court if the mischaracterization has only a de minimus effect on the division. See itation case-ids="9277741" index="107" url="https://cite.case.law/sw3d/131/605/#p617">id.
Michael has not attempted to show how the erroneous characterization of community property as separate property, during the four month period preceding their divorce for 2016 income tax purposes, caused the trial court to abuse its discretion in the overall division of the community estate; nor did he show that the mischaracterization had more than a de minimus effect on a just and right division of the community estate. See Palaez v. Juarez, No. 04-14-00022-CV, 2014 WL 7183483, at *4 (Tex. App.-San Antonio Dec. 17, 2014, pet. denied) (mem. op.). (refusing to reverse based on trial court's erroneous mischaracterization of a community asset as separate property because husband did not attempt to demonstrate how mischaracterization caused trial court to abuse its discretion in overall division of community estate or attempt to show that it had more than de minimus impact on just and right division of community estate). Accordingly, we overrule Michael's eleventh and twelfth issues. See Haining , 2010 WL 1240752, at *11 ; see also Pace v. Pace , 160 S.W.3d 706, 716 (Tex. App.-Dallas 2005, pet. denied) (overruling husband's mischaracterization complaint because husband failed to conduct a harm analysis; husband made "no argument as to why the property division is unfair or unjust apart from the alleged mischaracterization").
D. Indemnification
In his thirteenth and fourteenth issues, Michael challenges the portion of the trial court's decree entitled "Indemnification" found on page 14 of the decree. That portion of the decree provides,
IT IS ORDERED that if any claim, action, or proceeding is hereafter initiated seeking to hold the party not assuming a debt, an obligation, a liability, an act, or an omission of the other party liable for such debt, obligation, liability, act or omission of the other party, that other party will, at his or her sole expense, defend the party not assuming the debt, obligation, liability, act, or omission of the other party against any such claim or demand, whether or not well founded, and will indemnify the party not assuming the debt, obligation, liability, act, or omission of the other party and hold him or her harmless from all damages resulting from the claim or demand.
Damages, as used in this provision, includes any reasonable loss, cost, expense, penalty, and other damage, including without limitation attorney's fees and other costs and expenses reasonably *134 and necessarily incurred in enforcing this indemnity.
IT IS ORDERED that the indemnifying party will reimburse the indemnified party, on demand, for any payment made by the indemnified party at any time after the entry of the divorce decree to satisfy any judgment of any court of competent jurisdiction or in accordance with a bona fide compromise or settlement of claims, demands, or actions for any damages to which this indemnity relates.
IT IS ORDERED that each party will give the other party prompt written notice of any litigation threatened or instituted against either party that might constitute the basis of a claim for indemnity under this decree.
We note that the decree also contains specific indemnification provisions, corresponding to particular obligations assigned to the parties in the decree. For instance, with respect to the debts assigned to Michael, the decree provides, "[T]he husband shall pay, as a part of the division of the estate of the parties, and shall indemnify and hold the wife and her property harmless from any failure to so discharge these items: [specific debts listed assigned to Michael]." The specific indemnity provisions are tied to the decree's property division and are consistent with statutory provisions that allow the trial court, in post-decree proceedings, "[to] render further orders to enforce the division of property made or approved in the decree of divorce" and "[to] render a money judgment for the damages caused by [the] failure to comply" with the decree. See TEX. FAM. CODE ANN. § 9.006 (West Supp. 2016), § 9.010 (West 2006).
Unlike the specific indemnity provisions, the general indemnification provision on page 14 of the decree is not limited to the debts, obligations, and liabilities addressed in the decree. Instead, it broadly provides that if a claim or suit is brought against one spouse, presumably by a third-party, to pursue a debt, obligation, or a liability belonging to the other spouse, then the other spouse must defend and indemnify the spouse, even if the claim is "not well-founded."
With regard to challenging this provision in the decree, Michael correctly points out, "There was absolutely no testimony, discussion or even mention that the parties would indemnify each other concerning any outstanding debt, obligation or other liability." We agree with Michael.
The record is clear. Donna did not plead, prove, or request the general indemnification relief awarded to her by the trial court in the decree.[5]
A default judgment must be supported by the pleadings. See TEX. R. CIV. P. 301 ; see also Stoner v. Thompson , 578 S.W.2d 679, 682 (Tex. 1979). "This rule is a specific application of the more general principle that a party may not be granted relief in the absence of pleadings to support that relief, unless the request for relief is tried by consent-a situation that cannot occur in the context of a default judgment." In re Marriage of Day , 497 S.W.3d 87, 90 (Tex. App.-Houston [14th Dist.] 2016, pet. denied) (citing Stoner , 578 S.W.2d at 682 ); Maswoswe v. Nelson , 327 S.W.3d 889, 895-96 (Tex. App.-Beaumont 2010, no pet.). "A party's pleadings must also be sufficient to provide the opposing party fair notice of the plaintiff's cause of action and the relief sought." Id. A pleading *135 provides "fair notice" when the opposing party can ascertain from the pleading the nature of the claims, the basic issues in controversy, and what testimony will be relevant to the claims. See Elite Door & Trim, Inc. v. Tapia , 355 S.W.3d 757, 766 (Tex. App.-Dallas 2011, no pet.) ; see also Boyles v. Kerr , 855 S.W.2d 593, 601 (Tex. 1993) (recognizing that court should liberally construe petition to determine what causes of action may be reasonably inferred from the pleading). A judgment not supported by the pleadings is erroneous. In re Marriage of Day , 497 S.W.3d at 90 (citing Cunningham v. Parkdale Bank , 660 S.W.2d 810, 813 (Tex. 1983) ).
Here, Michael did not have fair notice that he was exposed to the additional liability of indemnifying and defending Donna for claims and lawsuits brought by third-parties against her for Michael's debts, obligations, and liabilities. By granting greater relief than Donna requested in her petition, the trial court erred. See ids="9951122" index="120" url="https://cite.case.law/sw2d/660/810/#p813">id. (holding trial court erred by awarding wife post-decree spousal maintenance in default judgment when she did not request that relief in her petition and modifying judgment to delete the award); see also Binder v. Joe , 193 S.W.3d 29, 33 (Tex. App.-Houston [1st Dist.] 2006, no pet.) (holding trial court erred in granting more relief than husband pleaded in petition).
We sustain Michael's thirteenth and fourteenth issues.
Appellate Attorney's Fees
In the decree, the trial court also awarded Donna $10,000 against Michael for attorney's fees on appeal. The award was "conditioned on the pursuit of an ultimately unsuccessful appeal." In his seventh and eighth issues, Michael challenges the $10,000 appellate attorney's fees award to Donna. Michael asserts that Donna failed to offer evidence to support the award. We agree.
We review the trial court's decision to award attorney's fees for abuse of discretion. Benoit v. Benoit , No. 01-15-00023-CV, 2015 WL 9311401, at *14 (Tex. App.-Houston [1st Dist.] Dec. 22, 2015, no pet.) (mem. op.) (citing Tomsu v. Tomsu , 381 S.W.3d 715, 719 (Tex. App.-Beaumont 2012, no pet.) ). To recover attorney's fees, the party must prove the reasonableness of the fees. Bocquet v. Herring , 972 S.W.2d 19, 21 (Tex. 1998) ; Benoit , 2015 WL 9311401, at *14. The non-exhaustive Arthur Andersen factors provide the guiding principle for determining whether attorney's fees are reasonable. Arthur Andersen & Co. v. Perry Equip. Corp. , 945 S.W.2d 812, 818 (Tex. 1997) ; Benoit , 2015 WL 9311401, at *14.
At the end of default hearing, Donna's attorney stated, "One more thing, Your Honor. In the event that he appeals this judgment [we request] that she be awarded a judgment against him of $10,000 for attorney's fees[.]" There was no further discussion of the appellate attorney's fees, and no evidence was offered regarding the reasonableness of the fees. We conclude that the trial court abused its discretion by awarding fees on appeal without supporting evidence demonstrating the reasonableness of the fees. See Tomsu , 381 S.W.3d at 719.
When a trial court grants an award of attorney's fees in a default judgment without any evidence in the record to support the award, the proper action on appeal is to remand the issue of attorney's fees to the trial court for a new hearing on the fees. In re C.L.W. , 485 S.W.3d 537, 542 (Tex. App.-San Antonio 2015, no pet.). In addition, remand of the attorney's fees is also appropriate because Michael was successful on appeal on the issues of indemnity and attorney's fees, and the attorney's *136 fees award should be reconsidered in light of that success. See Prudential Ins. Co. v. Durante , 443 S.W.3d 499, 515 (Tex. App.-El Paso 2014, pet. denied) (reversing and remanding appellate attorney fee award for redetermination because appeal was partially successful). "An appellee may not recover attorney's fees for work performed on any issue of the appeal where the appellant was successful." Jacks v. G.A. Bobo , No. 12-10-00163-CV, 2011 WL 2638751, at *5 (Tex. App.-Tyler June 30, 2011, pet. denied) (mem. op.).
We sustain Michael's seventh and eighth issues.
Conclusion
We reverse the portion of the judgment awarding appellate attorney's fees to Donna and remand the issue for a new hearing. We modify the judgment by deleting the portion of the judgment on page 14, which orders Donna and Michael to defend and indemnify one another for claims brought against a spouse based the other spouse's debts, obligations, or liabilities. Other than the portion of the judgment awarding appellate attorney's fees, we affirm the remainder of the judgment as modified.

Because the record indicates that Francis Michael Lynch prefers to use his middle name, Michael, we refer to him as Michael.

The record shows that Michael went on a trip to Italy not long after the emails were received with one his paramours. In support of his motion for new trial, Michael had claimed that he did not read the enforcement petition after it was served on him because he had been "extremely busy at work" and because he "was about to leave on a personal trip to Italy scheduled for April 15-30."

Although Michael claims that Donna was awarded 100% of the community estate, Donna disputes this figure. We note that determining the precise portion of the estate awarded to each party is difficult to ascertain. Donna's inventory, which was admitted into evidence, provided a value for many of the community assets and provided a total value for the community estate of $3.367 million. In addition, Donna testified regarding the value of the assets listed in her inventory and regarding the total value of the community estate. However, the evidence showed that the value for a number of the financial and retirement accounts identified by Donna in her inventory, including an account awarded to Michael in the decree, had unknown values. Donna points out in her brief that she "was denied use of any discovery tools" to ascertain all of the couple's marital assets because Michael did not appear in the trial court proceedings. At the default hearing, Donna testified that she believed that the community estate was actually worth $5,000,000 based on Michael's profile on the Seeking Arrangement's website, but she was unable to locate $5 million in assets. Thus, to the extent that Michael characterizes the award Donna received as being 100% of the community estate, such characterization may not be entirely accurate; however, Donna does not dispute that she requested and received a disproportionate share of the community estate.

Relevant to the Murff factors Donna testified that she is 60 years old, without a college education, and had not been in the workforce during her 28-year marriage to Michael. She testified that she had been seeking employment, but due to her age and lack of education, she had been unable to find a job. In contrast, Donna stated that Michael is four years younger than her. He has a college degree and a job at an energy company for which he earns $700,000 per year. She stated that Michael is in good health and would be able to continue to work and earn money after the divorce, while she would no longer have the benefit of his income. Donna testified that she needed the assets she would receive in the divorce to support herself in the future. She told the trial court that she was requesting a disproportionate amount of the community estate because that would be "the only money" she would have after the divorce. See O'Carolan v. Hopper , 71 S.W.3d 529, 532 (Tex. App.-Austin 2002, no pet.) (recognizing that disparity in earning capacity is factor weighing in favor of awarding disproportionate share of community estate to lower income earner); Nowzaradan v. Nowzaradan , No. 01-05-00094-CV, 2007 WL 441709, at *7 (Tex. App.-Houston [1st Dist.] Feb. 8, 2007, no pet.) (mem. op.) (upholding 70%-30% division of community estate in wife's favor by considering, inter alia, that wife had not been employed during her 27-year-marriage and had "little reasonable expectation of financially successful employment after [her] divorce" to her husband, a successful physician, who was expected to continue working after the divorce).

As mentioned, in contrast, the specific indemnity provisions in the decree are concomitant to the enforcement of particular awards and obligations ordered by the trial court as part of the property division.