

# NUMBER 13-17-00046-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

MARSHA ELLISON D/B/A
ELLISON LEASE OPERATING,          Appellant and Cross-Appellee,

v.

THREE RIVERS ACQUISITION LLC;
THREE RIVERS OPERATING CO. LLC;
CONCHO RESOURCES, INC.;
COG OPERATING, LLC,          Appellees and Cross-Appellants,

SAMSON RESOURCES CO.;
SAMSON LONE STAR LIMITED
PARTNERSHIP; SAMSON LONE
STAR LLC; SAMSON EXPLORATION, LLC;
S/D OIL AND GAS CORP.; ET AL.,          Appellees.

On appeal from the 51st District Court
of Irion County, Texas.

# MEMORANDUM OPINION ON REMAND

## Before Chief Justice Contreras and Justices Longoria and Hinojosa
## Memorandum Opinion on Remand by Justice Longoria

On February 10, 2022, on remand from the Texas Supreme Court, this Court affirmed as modified in part and reversed and remanded in part the trial court's orders. *See Ellison v. Samson Res. Co.*, No. 13-17-00046-CV, 2022 WL 400828, at *1 (Tex. App.—Corpus Christi–Edinburg Feb. 10, 2022, no pet.) (mem. op.). Appellant Marsha Ellison d/b/a Ellison Lease Operating has filed a motion for rehearing. We have also received several amicus curiae letters regarding our earlier memorandum opinion. After examining and fully considering the issues raised in Ellison's motion, we deny the motion, withdraw our prior opinion and judgment, and issue this opinion and judgment in their stead.

This matter has been remanded to this Court from the Texas Supreme Court. The underlying suit concerns the boundary between two mineral leases in Irion County.[1] This case is principally a trespass-to-try-title suit between the lessees of adjacent mineral estates. Ellison alleges that appellees Concho Resources, Inc., COG Operating LLC, Three Rivers Acquisition LLC, and Three Rivers Operating Company (collectively, "Concho"); Samson Resources Co., Samson Exploration, LLC, Samson Lonestar, LLC, and Samson Lonestar Limited Partnership (collectively, "Samson"); Sunoco Logistics Partners Operations GP LLC, and Sunoco Partners Marketing & Terminals L.P.

---

[1] On original submission, this cause was before this Court on transfer from the Third Court of Appeals in Austin pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

(collectively, "Sunoco") drilled several wells either on appellant's leasehold or closer to the lease line than Railroad Commission rules allow. Appellees, relying on a boundary stipulation between the fee owners of the two mineral estates and appellant's written acceptance of the stipulation, claimed that appellant ratified the agreed boundary line, foreclosing the trespass claims.

On original submission, this Court was asked by appellant to determine whether the trial court erred in granting summary judgment in favor of appellees. We determined that the trial court erred in granting summary judgment in appellees' favor and reversed the judgment. *See Ellison v. Three Rivers Acquisition LLC*, 609 S.W.3d 549, 565 (Tex. App.—Corpus Christi–Edinburg 2019) (*Ellison I*), *rev'd sub nom. Concho Res., Inc. v. Ellison*, 627 S.W.3d 226 (Tex. 2021) (*Ellison II*). The Texas Supreme Court reversed our opinion, holding "that the boundary stipulation is valid and that [appellees] conclusively established their ratification defense." *Ellison II*, 627 S.W.3d at 228. Ultimately, the Texas Supreme Court concluded that the trial court's granting of summary judgment was proper. *Id.* at 239.[2]

---

[2] To the extent that Ellison argues in her motion for rehearing that the Texas Supreme Court's decision regarding summary judgment was erroneous, we note that as an intermediate appellate court, we are bound by supreme court precedent. *See Tex. Office of Comptroller of Pub. Accts. v. Saito*, 372 S.W.3d 311, 315–16 (Tex. App.—Dallas 2012, pet. denied) (citing *Dall. Area Rapid Transit v. Amalgamated Transit Union Local No. 1338*, 273 S.W.3d 659, 666 (Tex. 2008) (recognizing as fundamental that supreme court decisions are binding on lower courts)). Further, Ellison's arguments that the supreme court failed to address certain issues with regard to her trespass to try title claim are without merit as the supreme court specifically stated: "The trial court correctly granted summary judgment in the defendants' favor on Ellison's trespass-to-try-title claim and bad-faith trespass claim." *Concho Res., Inc. v. Ellison*, 627 S.W.3d 226, 238 (Tex. 2021). We will not second-guess the supreme court's decision regarding Ellison's trespass to try title claim.

In our original opinion, because we reversed the trial court's summary judgment in favor of appellees, we necessarily overruled Concho's issues presented on cross-appeal. *See Ellison I*, 609 S.W.3d at 565. The Texas Supreme Court, having reversed our summary judgment ruling, remanded the case to this Court "to consider the parties' unaddressed issues regarding Concho's counterclaims." *Ellison II*, 627 S.W.3d at 239. In one of those unaddressed issues, Ellison argues the trial court reversibly erred in "not entering a take-nothing judgment for Ellison on the Concho/Three River[s] breach of contract counterclaim." Additionally, on cross-appeal, Concho argues that the trial court erred by not awarding: (1) lost profit damages; (2) prejudgment interest; (3) attorneys' fees in connection with the defense and prosecution of claims under the Declaratory Judgment Act; and (4) appellate attorneys' fees. We affirm as modified in part and reverse and remand in part.

## I. BACKGROUND

We previously described the background of the case as follows:

> When J.D. Sugg died in 1925, his estate and family assumed 100% ownership of "Section 1," a 640-acre tract of land. Sugg's estate is the source of title to the 154 acres of land that are in dispute. Some of Sugg's heirs agreed to swap land with the Noelkes, nearby landowners. To effectuate the swap, the Sugg family executed a deed on July 26, 1927 ("the 1927 Deed"). One of the tracts conveyed in that deed is described as "Second Tract: All of Survey 1, Block 6, H & T.C. Ry. Co. lands located North and West of the public road which now runs across the corner of said Survey, containing 147 acres, more or less" (the "Northwest Tract"). In 1930, the executor of Sugg's estate conveyed to A.A. Sugg by partition deed the remaining 493 acres (the "Southeast Tract"). This deed did not describe the boundaries or location of the Southeast Tract; the deed simply referred to it as the "493 acre tract." Below is a relative representation of the relevant area.

4



In 1939, the Sugg family commissioned a survey. According to the 1939 survey, the 1927 deed conveys all of the land north and west of the public road, including the disputed 154 acres; the survey also stated that the Northwest Tract contains 301 acres.

Between 1927 and 1987, the Northwest Tract was conveyed multiple times; by 1987, the Pilon Family Trust and three individuals owned the mineral estate of the Northwest Tract. On July 8, 1987, the Pilon Family Trust and the three individuals granted four identical oil and gas leases ("the Pilon Leases") to Questa Oil & Gas Co. ("Questa"). The description of the land leased in each of these Pilon Leases is as follows:

> 147 acre tract of land out of Survey 1, Block 6, H & TC Ry. Co. Survey, Abst. 312, lying N and W of the public road which runs NE and SW across said Survey 1, and being the same land conveyed to W.M. Hemphill, Trustee by E.S. Briant, Indep. Exec. of the Estate of J.D. Sugg, dec'd by Deed dated 7-26-27 & recorded in Bk. 17, Pg. 118.

5

Through a series of assignments, Questa's leasehold was assigned to Jamie Ellison, d/b/a Ellison Lease Operating in 1996. At about the same time, William and Carol Richey acquired the mineral fee interest in the Northwest Tract. Jamie and Marsha Ellison became the designated operators of Pilon Well #1, an oil and gas well drilled in the Northwest Tract. Marsha Ellison has continued as the sole operator since her husband's death in 2011. Through the duration of the leases, the Ellisons posted Railroad Commission signs at the gate entrance of the Northwest Tract on the public road boundary, designating themselves as owners and operators of the Pilon Leases and claiming 320 acres, consistent with their Railroad Commission filings. Irion County property tax public records and Ellison's income tax records also indicate that the Ellisons have claimed title to the disputed 154-acre since they received title.

Between 1930 and 2006, the Southeast Tract passed through the estate of A. A. Sugg to various family members. In 2005, the Suggs claimed that the Southeast Tract only contained 339 acres for ad valorem tax purposes on the Irion County tax rolls. In 2006, the mineral owners of the Southeast Tract (various members of the Sugg and Farmar families) granted an oil and gas lease to Samson.

In 2006, a Sugg family owner of the Southeast Tract executed and recorded a gift mineral deed, conveying the Southeast Tract to his four children. This deed is the only Sugg chain of title document that describes the boundaries of the Southeast Tract: "being a tract of land lying South and East of the public road which runs NE and SW across Survey [Section] 1, containing 493 acres, more or less." The four children subsequently executed the Sugg Lease of the Southeast Tract to a Samson affiliate and recorded a lease memorandum.

In October of 2006, Samson received a title opinion addressed to Tim Reece, Samson's landman; the title opinion covered the Southeast Tract, for purposes of drilling Samson's Sugg Well #1 on the tract. The title opinion acknowledges the Sugg 2005 property tax document showing that the Suggs only claimed 339 acres of land. The title opinion also advised that the 1927 Deed tract is shaped approximately like a triangle, which would be true only if the disputed 154 acres were part of the Northwest Tract. Furthermore, the attorney who wrote the title opinion warned that the Southeast Tract description in the original 1930 Sugg deed was defective and opined that he saw "no evidence of where the 493 acres is located on the ground. As a technical matter, this description is incorrect." Samson's surveyor prepared a preliminary survey plat (the Samson plat) for a W-1 well permit application. In the plat, Samson instructed the surveyor to credit 493 acres to the Southeast Tract.

6

In December of 2006, landman Reece sent a letter to the Ellisons titled "Statewide Rule 37 Exception Request" for Samson's Sugg Well #1 location. This letter did not include the Samson Plat. Instead, it asked the Ellisons to waive objections to Samson's application to locate Sugg Well #1 "100 feet South of the public road." The letter to the Ellisons shows an execution date of January 1, 2007. A similar letter was addressed to the Richey family as the owners of the mineral interest of the Northwest Tract. Later in 2007, after drilling Sugg Well #1, Samson received a division order title opinion for Sugg Well #1 and the Southeast Tract, again addressed to Reece. Comment No. 4 in the opinion repeated the concern from the 2006 title opinion that the Sugg Lease Southeast Tract description was inadequate; it further counseled to confine drilling to land not located within the boundary of the 1927 Deed tract. Over the next two years, Samson filed well applications for Wells #2, #3, and #4. In all these applications, Samson included the disputed 154 acres as part of the Southeast Tract.

In 2007, the Sugg family surface owners of the Southeast Tract executed a warranty deed that purported to convey to the Richey family only the surface of a "certain tract of land," located north and west of the public road, which "would be considered 154 acres." This deed vaguely asserted that the "South Boundary" of the Northwest Tract was located somewhere north and west of the public road and yet south of Richey's tract (see the approximate location of this "new boundary" on the map above). According to the record, Reece averred that he spoke with Jamie Ellison at this time, and again in 2008, to explain the legal effects of this deed.

In 2008, Samson proposed to drill Sugg Well #3, which is within the disputed 154-acre tract. Reece prepared a boundary stipulation of Ownership of Mineral Interest Agreement ("the 2008 Boundary Stipulation") for execution by the Sugg family and Richey family mineral owners. The Boundary Stipulation acknowledged that the Southeast Tract constituted only the "remaining" acreage in Section 1, after giving full effect to the 1927 Deed conveyance. However, Reece asserted in the Boundary Stipulation that there was a "question" as to the "physical location" of the 1927 Deed tract, which Reece claimed only contained 147 acres. The Boundary Stipulation purported to resolve the question by using the "new" boundary from Samson's 2008 New Survey Plat, which was a repeat of Samson's 2006 Preliminary Survey. The plat further gave credit to the 2007 Sugg Deed, stating that the surface and mineral ownership "appear to be different." The Boundary Stipulation stated it was effective as of July 8, 1987, the date the Pilon Leases were created.

In 2008, Reece delivered a letter to Jamie Ellison. The letter purportedly included a copy of the Boundary Stipulation and asserted that Reece had conversed with Jamie in 2007 about its subject matter. Reece represented to Jamie Ellison in the letter that the 2008 Boundary Stipulation was created and executed in 1987, even though it was written by Reece in 2008. Reece's letter to Jamie did not contain any words of conveyance; it simply requested, "Please signify your acceptance of the description of the Richey 147-acre tract as set out in the [Boundary] Stipulation by signing both copies of this letter ... Upon your acceptance a more formal and recordable document will be provided." There is no evidence that any such second document was prepared or delivered to the Ellisons. Jamie Ellison allegedly signed and returned the letter although Marsha Ellison alleges that his signature was possibly forged. The record also reflects that Concho was unaware of Reece's letter until December of 2013, six months after Ellison filed this suit.

Samson subsequently drilled Sugg Well #3 within the disputed 154-acre tract. Well #4 was drilled in a location that is closer than the minimum distance required from the Northwest Tract, assuming the public road is the boundary. *See* 16 TEX. ADMIN. CODE § 3.37(a) (2018) (Tex. R. R. Comm'n, Statewide Spacing Rule).

In 2010, Samson sold the Sugg Lease and Sugg Wells #1, #3, and #4 to Three Rivers Acquisition LLC by quitclaim assignment. Three Rivers Acquisition LLC recompleted Sugg Well #1 without obtaining a new Rule 37 exception permit. In 2011, Three Rivers Acquisition LLC obtained an additional title opinion for the Southeast Tract. In 2012, Three Rivers Acquisitions LLC assigned the lease to COG Operating LLC. Concho also obtained a title opinion for the Southeast Tract. Throughout this time period, Sunoco purchased the oil produced from Sugg Wells #1, 3, and 4.

In 2013, Ellison filed a trespass-to-try-title suit against Concho and Samson. Concho filed counterclaims against Ellison for breach of contract and declaratory judgment. Both Ellison and Concho filed cross-motions for summary judgment. Concho argued that the 2008 letter to Jamie Ellison: (1) relinquished any claim of ownership Ellison might possess to land beyond the 147-acre tract as depicted in the 2008 Boundary Stipulation; and (2) ratified the boundary as depicted in the 2008 Boundary Stipulation and letter. The trial court granted Concho's motion and dismissed all of Ellison's claims with prejudice.

Ellison settled her claims against Samson; however, Samson remained in the suit because Sunoco filed a cross-claim against Samson for indemnification. Against Sunoco, Ellison alleged claims of conversion

and a claim for damages under section 91.404 of the Texas Natural Resources Code ("the division order statute"). *See* TEX. NAT. RES. CODE ANN. § 91.404. Sunoco filed one motion for summary judgment jointly with Samson and one motion for summary judgment separately; both generally argued that Ellison's claims against Sunoco fail regardless of the ownership of the disputed 154 acres because Sunoco was not the "payor" under the division order statute. The joint motion was concerned with Ellison's claims against Sunoco for the time period during which Samson operated the wells and sold the oil produced from the wells to Sunoco. Sunoco's separate motion dealt with Ellison's claims relating to the time periods that Samson's successors-in-interest owned and operated the wells and sold the oil produced to Sunoco. The trial court granted both motions for summary judgment and dismissed Ellison's claims against Samson and Sunoco.

After the trial court granted the motions for summary judgment in favor of Sunoco, Samson, and Concho, Concho was realigned as the plaintiff and the case proceeded to trial on Concho's counterclaim. The jury returned a verdict in favor of Concho, finding that the 2008 letter constituted an agreement and that Ellison Lease Operating breached the agreement. Concho was awarded $493,581.39 in lost profits and $850,000 in attorneys' fees at the trial court level and $0 in attorney's fees at the appellate level. Concho moved for judgment on the verdict, notwithstanding the verdict as to the appellate fees. Ellison moved for judgment notwithstanding the verdict. The trial court signed a judgment providing that Ellison take nothing; the judgment also offered declaratory relief that: (1) the boundary between the leaseholds was the boundary as established in the 2008 Boundary Stipulation; and (2) the 2008 letter agreement is enforceable according to its terms. It awarded $1,030 in out-of-pocket damages to Concho for breach of contract and $392,479.39 in attorneys' fees for the breach of contract claim; the judgment declined to award lost-profits damages or attorneys' fees on the declaratory judgment claim. The judgment also awarded no appellate attorneys' fees. Ellison appealed, and Concho has cross-appealed.

*Ellison I*, 609 S.W.3d at 553–58.

## II. CONCHO'S COUNTERCLAIMS

## A. Judgment Notwithstanding the Verdict

In her fourth issue on appeal, Ellison contends that the trial court reversibly erred in denying her motion for judgment notwithstanding the verdict (JNOV) and "not entering

a take-nothing judgment for Ellison on [Concho's] breach of contract claim." In numerous sub-issues, Ellison states that the trial court should have entered a take-nothing judgment on the breach of contract claim because: (1) she established as a matter of law that the 2008 letter agreement did not constitute an enforceable contract; (2) there was no "meeting of the minds" or consideration for the contract; (3) Concho did not have standing to bring a breach of contract claim; and (4) the contract was unenforceable as a matter of law as against public policy. Ellison's fourth issue further argues (5) even if there was a contract, the trial court erred by awarding attorney's fees; and (6) her evidence "regarding the status of [her] title to the [d]isputed 154 Acres" should not have been excluded.

A trial court may disregard a jury's findings and grant a motion for JNOV only when a directed verdict would have been proper. *See* TEX. R. CIV. P. 301; *Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991); *see also Prudential Ins. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000) (directed verdict proper only when evidence conclusively establishes right of movant to judgment or negates right of opponent or evidence is insufficient to raise material fact issue); *Cain v. Pruett*, 938 S.W.2d 152, 160 (Tex. App.—Dallas 1996, no writ) (directed verdict proper when evidence reflects that no other verdict can be rendered and moving party is entitled to judgment as a matter of law). A JNOV should be granted when the evidence is conclusive and one party is entitled to recover as a matter of law or when a legal principle precludes recovery. *Morrell v. Finke*, 184 S.W.3d 257, 290 (Tex. App.—Fort Worth 2005, pet. denied); *see also United Parcel Serv., Inc. v. Tasdemiroglu*, 25 S.W.3d 914, 916 n.4 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ("A court should grant a motion for

10

judgment notwithstanding the verdict if a legal principle prevents a party from prevailing on its claim.").

An appellate court reviews a JNOV under a no-evidence standard of review. *See Garton v. Rockett*, 190 S.W.3d 139, 144 (Tex. App.—Houston [1st Dist.] 2005, no pet.). A JNOV is proper only if there is no evidence to support an issue, or conversely, if the evidence establishes an issue as a matter of law. *See Best v. Ryan Auto Grp., Inc.*, 786 S.W.2d 670, 671 (Tex. 1990); *Garton*, 190 S.W.3d at 144. To determine whether there is no evidence to support the jury's finding, "we must view the evidence in a light that tends to support the finding of disputed fact and disregard all evidence and inferences to the contrary." *Wal–Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003). If more than a scintilla of evidence supports the jury's finding, JNOV is improper *Id.* More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). Evidence that is "so weak as to do no more than create a mere surmise," however, is no more than a scintilla and, thus, no evidence. *Id.* (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

### 1.    2008 Samson Letter

To prove a breach of contract claim, a plaintiff must establish the existence of a valid contract, performance or tendered performance by the plaintiff, the defendant breached that contract, and damages resulting from the breach. *Dixie Carpet Installations, Inc. v. Residences at Riverdale, LP*, 599 S.W.3d 618, 625 (Tex. App.—

Dallas 2020, no pet.). The elements of a valid contract are (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Prime Prods., Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). The elements of written and oral contracts are the same and must be present for a contract to be binding. *Wal–Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 555 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

Relying on *North Shore Energy, L.L.C. v. Harkins*, 501 S.W.3d 598, 605 (Tex. 2016), Ellison argues that "the Ellisons never executed a conveyance of their vested leasehold title to the [d]isputed 154 Acres" and therefore "the 2008 Samson Letter is not a valid enforceable contract." Concho asserts that *North Shore Energy* is inapposite to the case before us, specifically arguing that the *North Shore Energy* case dealt with an option contract, whereas here Concho contends the 2008 letter constitutes a binding agreement, not an option contract.

Ellison's argument is essentially that the 2008 letter agreement was not binding because, as in *North Shore Energy*, the "more formal recordable" document was never received. *See id.* at 605–06. This argument falls flat in light of the Texas Supreme Court's holding that the "absence of the contemplated 'more formal and recordable document' [is not] fatal to Concho's ratification defense." *Ellison II*, 627 S.W.3d at 237; *cf. N. Shore Energy*, 501 S.W.3d at 605 (noting that "[a]n option agreement does not pass title or convey an interest in property"). As a result of its determination, the supreme court went on to hold that "in light of the valid boundary stipulation and the signed 2008 letter, Ellison

12

as a matter of law ratified the boundary line contained in the stipulation as the boundary of Ellison's leasehold." *Ellison II*, 627 S.W.3d at 237. Accordingly, Ellison's sub-issue related to the existence of a contract is overruled.

### 2. Meeting of the Minds

A "meeting of the minds" is required for a contract to be valid and thus enforceable. *See USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). A meeting of the minds occurs if there is a mutual understanding and assent to the agreement regarding the subject matter and the essential terms of the contract. *City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 720 (Tex. App.—Fort Worth 2008, pet. dism'd). Whether there is a meeting of the minds is a question of fact. *Franco v. Ysleta Indep. Sch. Dist.*, 346 S.W.3d 605, 608 (Tex. App.—El Paso 2009, no pet.). Whether the parties came to a meeting of the minds is based on an objective standard of what they said and did. *See In re S.M.H.*, 523 S.W.3d 783, 795 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

Courts have recognized that where one party has performed his part of a contract, the "law favors finding agreements sufficiently definite for enforcement," and when the parties' actions demonstrate that they intended to create a binding agreement—even if one or more terms are left to be agreed upon—courts will "endeavor, if possible, to attach a sufficiently definite meaning to the bargain." *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 240 (Tex. 2016) (quoting *Tanenbaum Textile Co. v. Sidran*, 423 S.W.2d 635, 637 (Tex. App.—Dallas 1967, writ ref'd n.r.e.)). Finally, the law disfavors finding contracts invalid, contracts are construed to avoid forfeitures, and "if the parties clearly intended to agree

13

and a 'reasonably certain basis for granting a remedy' exists, [courts] will find the contract terms definite enough to provide that remedy." *Id.* at 239 (quoting RESTATEMENT (2d) of Contracts § 33 cmt. b.) (1981); *see also Burbach v. Stearns*, No. 03-20-00399-CV, 2022 WL 406390, at *4 (Tex. App.—Austin Feb. 10, 2022, pet. denied) (mem. op.).

Ellison contends that the 2008 letter was unenforceable as a contract because there was no "meeting of the minds" as to all material terms. She specifically states, "some of the missing material terms include:" consideration, effective date, grantee identification, warranty of title information, specific well location, and the "form of the Second Document." An argument that there was no consideration for a written document requires a verified denial, which is lacking here. *See* TEX. R. CIV. P. 93(9) (lack of consideration is a defense that must be supported by a verified plea). Because there is no verified plea, Ellison has waived this argument on appeal. *See Nootsie, Ltd. v. Williamson Cnty. Appraisal Dist.*, 925 S.W.2d 659, 662 (Tex. 1996).[3]

As to the effective date, Ellison cites *Oakrock Exploration Co. v. Killam*, 87 S.W.3d 685,690–91 (Tex. App.—San Antonio 2002, pet. denied), without any substantive analysis, seemingly for the proposition that absent an effective date, the contract is void. However, we note that "[t]he material terms of a contract are determined on a case-by-case basis," *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013),

---

[3] We note that in a footnote in her brief, Ellison contends that she "previously filed a verified denial of any consideration . . . as part of her Response pleading . . . to [Concho's] MSJ . . . Ellison directs our attention to an affidavit she filed prior to Concho's breach of contract claim being filed, wherein, among her other reasons for asserting the invalidity of the agreement, she generally states that the her husband would not have reached an agreement where they would not be paid for their land. Ellison's general statement regarding payment does not amount to a defense of lack of consideration in her affidavit. Accordingly, because a verified pleading asserting a defense of lack of consideration was not filed in response to Concho's breach of contract claim, Ellison has waived her right to argue lack of consideration on appeal. *See Nootsie, Ltd. v. Williamson Cnty. Appraisal Dist.*, 925 S.W.2d 659, 662 (Tex. 1996).

14

and "[e]ach contract should be considered separately to determine its material terms." *T.O. Stanley*, 847 S.W.2d at 221. In *Oakrock*, an oil and gas lease omitted the drilling commencement date. *See Oakrock*, 87 S.W.3d at 690–91. There, after considering the arguments by the parties, the court specifically expressed that a commencement date was an essential element of the oil and gas lease at issue. *See id.* Here, however, Ellison presents no argument or analysis as to why an effective date would be considered an essential material term to this contract. *See* TEX. R. APP. P. 38.1(i). Additionally, Ellison generally states that there was no identified grantee. Ellison, however, provides no case law or other legal authority in support of this assertion, nor does she provide analysis on the issue. *See id.* In a footnote, Ellison contends that there was testimony that "title warranties can be a 'really important' term of any oil and gas lease rights agreement," but she provides no argument to support her contention that title warranties would be an *essential* term in this instance. *See id.* With no discussion, Ellison also provides a citation to *Smith v. Sabine Royalty Corp.*, 556 S.W.2d 365, 379 (Tex. App.—Amarillo 1977, no writ), for the proposition that "terms of agreement [were] not sufficiently definite because such common terms as . . . warranties were not mentioned." (emphasis by Ellison omitted).

Though she does not make this assertion outright, in her minimal discussion in this section regarding a meeting of the minds, the cases Ellison cites suggest that Ellison considers the agreement to be an oil and gas lease if anything. *See Oakrock*, 87 S.W.3d at 690–91; *Smith*, 556 S.W.2d at 379. Concho, however, contends that Ellison's "arguments" in this regard are misplaced, as the 2008 letter amounted to a real estate

agreement or a quitclaim deed. In that regard, Ellison's contentions that the document was missing the specific location for the well are unfounded as the 2008 letter was intended to establish land boundaries, not determine well location. Again, Ellison provides no support, citation, authority, or argument to further her assertion that the location of the well was material to the contract. *See* Tex. R. App. P. 38.1(i).

As her last point in this sub-issue, Ellison contends that no meeting of the minds occurred because the contract lacked the "form of the [s]econd [d]ocument." However, we need not address this point as the supreme court held that the "absence of the contemplated 'more formal and recordable document' [is not] fatal to Concho's ratification defense." *Ellison II*, 627 S.W.3d at 237. Accordingly, the lack of a second document cannot be held to invalidate the contract.

### 3. Standing

By another sub-issue to her fourth issue, Ellison argues that Concho lacked standing to bring the breach of contract claim, as any alleged breach of contract claim belonged to Samson. Under the general law of contracts, a party must show either privity or third-party-beneficiary status in order to have standing to sue for breach of contract. *OAIC Com. Assets, L.L.C. v. Stonegate Vill., L.P.*, 234 S.W.3d 726, 738 (Tex. App.— Dallas 2007, pet. denied). Privity exists if the defendant was a party to an enforceable contract with either the plaintiff or someone who assigned his or her cause of action to the plaintiff. *Id.* "A party's standing is determined at the time suit is filed, and we look to the facts alleged in the petition and may consider other evidence in the record, if

16

necessary, to resolve the question. *John C. Flood of DC, Inc. v. SuperMedia, L.L.C.*, 408 S.W.3d 645, 650 (Tex. App.—Dallas 2013, pet. denied) (citations omitted).

Concho's counterclaim for breach of contract alleged Ellison breached her "contractual obligations and duties to Concho and Three Rivers, as assignees of Samson." Ellison argues that Concho did not establish standing to bring a breach of contract claim because the cause of action was never assigned to Concho. Concho, however, responds that the evidence showed that it "has succeeded to Samson's rights under the 2008 letter agreement." We agree with Concho. There was testimony related to the sale of the assets of Samson to Three Rivers and subsequently Concho. Because Concho had acquired all of Samson's assets related to the 2008 letter agreement, they necessarily obtained privity with the contract. *See Royalco Oil & Gas Corp. v. Stockhome Trading Corp.*, 361 S.W.3d 725, 730 (Tex. App.—Fort Worth 2012, no pet.) (citing *Amco Trust, Inc. v. Naylor*, 317 S.W.2d 47, 50 (Tex. 1958)). There is no dispute that Samson could have brought the claim against Ellison; having become the assignee of Samson's contract with Ellison, Concho had standing to bring the breach of contract claim. *See Amco Trust*, 317 S.W.2d at 50.

### 4.    Public Policy

Ellison further claims that even if the 2008 letter could be construed as a contract, it is unenforceable as it is "illegal" and against the public policy of Texas. Ellison contends that Concho made misrepresentations in an attempt at a "land grab" to "steal" her land and oil. Illegality is an affirmative defense, and the burden is on the defendant to plead and prove the illegality. TEX. R. CIV. P. 94; *Plano Surgery Ctr. v. New You Weight Mgmt.*

17

*Ctr.*, 265 S.W.3d 496, 501–02 (Tex. App.—Dallas 2008, no pet.). "When the illegality does not appear on the face of the contract, it will not be held illegal and thus void unless the facts showing its illegality are before the court." *Plano Surgery Ctr.*, 265 S.W.3d at 501 (citations omitted).

Here, the 2008 letter is not facially illegal. The letter merely sets out boundaries and seeks acceptance of the boundary line as set forth in the stipulation. Accordingly, Ellison was required to plead and prove the illegality, which she did not do. Therefore, Ellison's illegality claim is waived. *See* TEX. R. CIV. P. 94; *Plano Surgery Ctr.*, 265 S.W.3d at 502. In any event, the supreme court held that there was no evidence in the record of fraud or misrepresentations made. *See Ellison II*, 627 S.W.3d at 236.

### 5. Attorneys' Fees

Ellison contends that the trial court's award of attorneys' fees for the breach of contract action was improper because: (1) there was no contract, and (2) Concho did not plead or prove presentment. We need not address her first point, having already determined there was a contract. Accordingly, we turn to Ellison's presentment argument.

A party prevailing on a breach of contract claim is entitled to recover reasonable attorney's fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8). The party seeking attorney's fees bears the burden of proof. *In re Nat'l Lloyds Ins.*, 532 S.W.3d 794, 809 (Tex. 2017) (orig. proceeding).

In order for a claimant to recover fees under this statute: (1) the claimant must be represented by an attorney; (2) presentment of the claim must be made to the opposing party or to a duly authorized agent of the opposing party; and (3) payment for the just

18

amount owed must not have been tendered before the expiration of the thirtieth day after the claim is presented. TEX. CIV. PRAC. & REM. CODE ANN. § 38.002. Presentment is required to allow the party against whom the claim is made an opportunity to pay within thirty days after receiving notice of the claim without incurring an obligation for attorney's fees. *Gibson v. Cuellar*, 440 S.W.3d 150, 157 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Although no particular form for presentment is required, merely filing a suit for breach of contract, by itself, does not constitute presentment. *Genender v. USA Store Fixtures, LLC*, 451 S.W.3d 916, 924 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Presentment must be specifically pleaded and proved by the claimant; however, in the absence of a special exception pointing out the lack of specific pleading of presentment, a pleading is construed liberally in favor of the pleader, and if the pleading gives "fair notice" that the party is seeking to recover attorney's fees under Chapter 38, that is sufficient to satisfy the presentment requirement. *See Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 897 (Tex. 2000); *see also Gibson*, 440 S.W.3d at 157 (noting that failure to specially except to lack of specific identification of attorney's fees statute resulted in liberal construction of pleadings in favor of the pleader). "In a breach of contract case, where the amount of damages i[s] not already fixed in advance, the presentment requirement can be met by presenting the contract claim to the opposing party and that party fails to tender performance." *Chandler v. Mastercraft Dental Corp. of Tex. Inc.*, 739 S.W.2d 460, 470 (Tex. App.—Fort Worth 1987, writ denied) (citing *Jones v. Kelley*, 614 S.W.2d 95, 100 (Tex. 1981)). Texas courts have found various forms of

presentment to be sufficient to support an award of attorney's fees, such as oral and written demands for admissions and responses thereto. *See Jones*, 614 S.W.2d at 100.

Here, Concho contends that it met the presentment requirement through its multiple demands to Ellison and her counsel to dismiss her claims and comply with the 2008 letter agreement, the breach of which forms the basis for Concho's claim. We agree. Concho repeatedly requested that Ellison abide by the stipulation as set forth in the 2008 letter agreement by demanding she dismiss her suit denying the existence of the agreement, thereby establishing a demand that Ellison perform on the contract. As such, we find sufficient presentment. *See id.*

### 6. Conclusion

Because Ellison did not establish that there was no evidence to support Concho's breach of contract claim as a matter of law, we find that the trial court did not err in "not entering a take-nothing judgment for Ellison on [Concho's] breach of contract claim." Ellison's fourth issue is overruled.

## B. Exclusion of Evidence and Charge Error

In her fifth issue, and in part of a sub-issue under issue four, Ellison contends that the trial court "committed harmful and reversible error" by: "(1) excluding all Ellison's evidence and denying her jury instructions and questions regarding the true state of her title to the [d]isputed 154 Acres at the time of the 2008 Letter, and (2) including [Concho's] erroneous Question No. 1 and instructions in jury Questions Nos. 1 & 2."

### 1. Evidentiary Ruling

We review the trial court's evidentiary ruling for an abuse of discretion. *Fleming v. Wilson*, 610 S.W.3d 18, 21 (Tex. 2020) (per curiam). Ellison first contends that the trial court erred in excluding her evidence and denying her proposed jury instructions relating to the "true state of her title" to the disputed property at the time of the 2008 Letter. Ellison's complaints on appeal related to the admission of evidence and charge error largely stem from her complaint regarding the trial court's granting of summary judgment. In her appellate briefing, Ellison notes that the instructions given were consistent with the summary judgment rulings, with which Ellison takes issue. The summary judgment rulings have been affirmed by the Texas Supreme Court in *Ellison II*, and therefore will not be addressed in this memorandum opinion on remand. *See* 627 S.W.3d at 239. In granting summary judgment, the trial court determined Ellison (1) relinquished any claim of ownership beyond the 147-acre tract of land depicted in the boundary stipulation, (2) ratified the boundary there depicted, and (3) waived any claim to the disputed acreage. These holdings by the trial court were affirmed by the supreme court, and we are bound by those decisions. *See id.*; *Dall. Area Rapid Transit v. Amalgamated Transit Union Local No. 1338*, 273 S.W.3d 659, 666 (Tex. 2008).

Here, while she frames her arguments as an attack on the admission of evidence and the jury charge, Ellison is ultimately arguing that the trial court erred by not allowing the jury to hear evidence relating to ownership of the parcel prior to any "ratification," stating that it affects the breach of contract claim. However, any evidence related to prior ownership of the tract in question would be irrelevant because the jury was only asked to

determine whether a breach occurred *subsequent* to the ratification, not who may or may not have had ownership prior to the ratification. *See* TEX. R. EVID. 401 (evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action"), 402 (irrelevant evidence is inadmissible). We cannot say that the trial court abused its discretion in excluding Ellison's evidence of ownership prior to ratification. *See Fleming*, 610 S.W.3d at 21.

### 2. Charge Error

Ellison next argues that the trial court erred by denying her jury instructions and questions "regarding the true state of her title to the [d]isputed 154 [a]cres at the time of the 2008 Letter" and by including "[Concho's] erroneous Question No. 1 and instructions in jury Questions Nos. 1 & 2." We review alleged error in the court's charge for abuse of discretion. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009). One way a trial court abuses its discretion is by failing to follow guiding rules and principles. *Id.* (citing *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998)). The trial court has considerable discretion in deciding whether a proposed instruction is necessary and proper to submit to the jury. *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 451–52 (Tex. 1997); *see Bryan v. Watumull*, 230 S.W.3d 503, 508 (Tex. App.—Dallas 2007, pet. denied) (holding trial court is afforded more discretion when submitting instructions than when submitting questions).

Under civil procedure rule 278, "[t]he court shall submit the questions, instructions[,] and definitions . . . which are raised by the written pleadings and the

evidence." *See* TEX. R. CIV. P. 278. This is a "substantive, non-discretionary directive to trial courts requiring them to submit requested questions to the jury if the pleadings and any evidence support them." *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992) ("trial court may refuse to submit an issue only if no evidence exists to warrant its submission") (citing *Brown v. Goldstein*, 685 S.W.2d 640, 641 (Tex. 1985)). An instruction is proper if it assists the jury, is supported by the pleadings or evidence, and accurately states the law. *Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162, 166 (Tex. 2002). A jury instruction is improper if it comments on the weight of the evidence or "nudge[s]" or "tilt[s]" the jury. *Wal–Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 724 (Tex. 2003); *Hamid v. Lexus*, 369 S.W.3d 291, 295 (Tex. App.—Houston [1st Dist.] 2011, no pet.). It can be error to give a jury instruction even when the instruction is a substantially correct statement of the law. *Liberty Mut. Ins. Co. v. Camacho*, 228 S.W.3d 453, 460 (Tex. App.—Beaumont 2007, pet. denied).

If matters are timely raised and properly requested for a trial court's charge to the jury, a judgment "cannot be permitted to stand when a party is denied proper submission of a valid theory of recovery or a vital defensive issue raised by the pleadings and evidence." *Exxon Corp. v. Perez*, 842 S.W.2d 629, 631 (Tex. 1992) (per curiam) (citations omitted).

### a. Ellison's Requested Instructions

Ellison complains that without her requested instructions, the jury was given a "false view of the relevant surrounding circumstances," particularly related to who had proper title to the disputed 154 acres. As we have previously stated, the trespass to try

title claim has been settled, as the supreme court determined that summary judgment on the issue was proper in favor of Concho. *See Ellison II*, 627 S.W.3d at 239. Accordingly, as the issue of title was not before the jury, any requested instruction relating to such issue was properly excluded.

### b.  Questions 1 and 2

Ellison also argues that the trial court erred in "including [Concho's] erroneous Question No. 1 and instructions in jury Questions Nos. 1 & 2." The trial court instructed the jury in question one that "[a]n unrecorded instrument is binding on a party to the instrument, on the party's heirs, and on a subsequent purchaser who does not pay a valuable consideration or who has notice of the instrument." Ellison argues on appeal that this instruction "forced" the jury to believe that the 2008 letter was a binding contract merely because it was signed. However, question one first instructs the jury to determine whether the 2008 letter constituted an agreement and states that "for an agreement to be formed, the minds of the parties must meet with respect to the subject matter of the agreement and all its essential terms." The later instruction regarding "an unrecorded instrument" is merely an explanation in furtherance of what the jury must find, instructing them that if they find a meeting of the minds, the unrecorded instrument is binding. If an instruction might aid the jury in answering the issues presented to them, or if there is any support in the evidence for an instruction, the instruction is proper. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012) (citing *La.-Pac. Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1998)). We do not find the complained-of section in question one to be susceptible to Ellison's interpretation as "stamped[ing]" the jury into the wrong conclusion.

24

Ellison complains that the second question tells the jury "that the mere execution of the Boundary Stipulation itself, *even without the executed 2008 Samson Letter*, 'establishes the location of the common boundary line.'" The jury was instructed to answer the second question if it answered question one affirmatively. Question two reads: "You are instructed that the Boundary Stipulation establishes the location of the common boundary line between [Ellison]'s and [Concho's] respective leasehold interests. Did [Ellison] fail to comply with the October 16, 2008 letter?" Ellison asserts that this question, as written, dictated a "yes" answer because if the boundary stipulation was binding, Ellison would have "automatically" breached the agreement by filing suit to claim the land. The trial court, however, had already ruled on summary judgment that the boundary stipulation was valid, so it was not error for the trial court to instruct the jury regarding the stipulation. As the trial court's summary judgment ruling has been upheld, we cannot hold that the instruction is erroneous.

Ellison's fifth issue is overruled.

### III.    CROSS-APPEAL

On cross-appeal, Concho argues that the trial court erred in denying the monetary damages as determined by the jury in connection with its counterclaim. More specifically, Concho challenges the trial court's failure to award: (1) lost profit damages; (2) prejudgment interest; (3) declaratory judgment attorneys' fees; and (4) appellate attorneys' fees.

### A.    Lost Profits

The trial court set aside the jury's finding that Concho suffered $492,551.39 in past

lost profits as a result of Ellison's breach of the agreement. By its first cross-issue, Concho argues that the trial court erred in granting Ellison's motion for JNOV because evidence existed to support the jury's findings that Concho was entitled to lost profits.

Question three of the jury charge stated:

Consider the following elements of damages, if any, and none other:

Reasonable and necessary expenditures made by [Concho] in reliance on the agreement.

Lost profits that were a natural, probable, and foreseeable consequence of Ellison Lease Operating's failure to comply with the agreement.

Do not add any amount for interest on damages, if any.

Answer separately, in dollars and cents for damages, if any.

What sum of money, if paid now in cash, would fairly and reasonably compensate [Concho] for its damages, if any, that resulted from such failure to comply?

The jury awarded $1,030 in reasonable and necessary expenditures made by Concho in reliance on the agreement and $492,551.39 in lost profits sustained in the past. In its final judgment, the trial court stated "notwithstanding the jury's answer to Question 3 [Concho] shall not recover past lost profits . . . ."

> Lost profits are damages for the loss of net income to a business and, broadly speaking, reflect income from lost business activity, less expenses that would have been attributable to that activity. *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002); *see generally Capital Metro. Transp. Auth. v. Cent. of Tenn. Ry. & Navigation Co.*, 114 S.W.3d 573, 581–82 & n.7 (Tex. App.—Austin 2003, pet. denied) (considering both income projections and specific expenses when evaluating proof of lost profits). Lost profits may be recovered for money that would have been made if the bargain had been performed as promised. *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 50 (Tex. 1998). To be recovered, lost profits must be proved with reasonable certainty and competent evidence. *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994).

26

Lost profits are recoverable only if the evidence shows that the loss of profits was a material and probable consequence of the breach complained of and the amount due is shown with sufficient certainty. *Cmty. Dev. Serv., Inc. v. Replacement Parts Mfg.*, 679 S.W.2d 721, 725 (Tex. App.—Houston [1st Dist.] 1984, no writ). Generally, lost profits are properly calculated by deducting from the actual contract price the costs of the injured party's performance supported by data. *Id.* "However, a witness may also prove lost profits by testifying as to what his profit would have been, based on his knowledge of the cost of performance of each element of the contract and subtracting the total of such costs from the contract price." *Id.*

"The requirement of 'reasonable certainty' in the proof of lost profits is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise." *SW Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1099 (1938). "What constitutes reasonably certain evidence of lost profits is a fact intensive determination. At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992); *see, e.g.*, *Pena v. Ludwig*, 766 S.W.2d 298, 304 (Tex. App.—Waco 1989, no writ); *Frank B. Hall & Co. v. Beach, Inc.*, 733 S.W.2d 251, 258 (Tex. App.— Corpus Christi–Edinburg 1987, writ ref'd n.r.e.); *Keller v. Davis*, 694 S.W.2d 355, 357 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.); *Automark of Tex. v. Disc. Trophies*, 681 S.W.2d 828, 830 (Tex. App.—Dallas 1984, no writ). "Although supporting documentation may affect the weight of the evidence, it is not necessary to produce in court the documents supporting the opinions or estimates." *Holt Atherton Indus., Inc.*, 835 S.W.2d at 84.

*B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 17–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

Concho argues that the jury was presented with ample competent evidence detailing the amount of lost future profits. Specifically, the jury heard testimony from a reservoir engineer, Aaron Hunter, who was hired in part to analyze the potential productivity and profitability of Concho's assets. Though not presented as an expert, Hunter opined that as of the time of the filing of Ellison's suit, one of the Sugg wells which was "taken off of the drilling schedule as a result of Ellison's leasehold claims," was

27

projected to provide a return of $499,561. Hunter provided a historical written analysis, which was submitted as evidence to the jury, to detail the potential profitability of the wells affected by Ellison's underlying claims.

Ellison argues that Hunter's testimony should have been excluded, and therefore disregarded. Ellison contends that Hunter was not designated as an expert witness, nor were his opinions disclosed in discovery, even though Hunter

> offered expert testimony based on specialized training and experience—well beyond the capacity of ordinary jurors—using specialized techniques and analytical tools, to estimate the quantity of minerals in a reservoir that could be produced over the life of a hypothetical well, along with the prices that could be obtained and the costs incurred.

## 1.    Property Owner Rule

Ellison's argument that Hunter's testimony should be disregarded is based on the contention that his testimony was within the realm of expert testimony. Relying on *Arkoma Basin Expl. Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 388 (Tex. 2008), Ellison argues the value opinions provided by Hunter in his testimony "require expert testimony." In *Arkoma*, the Texas Supreme Court noted that "the value of mineral reserves is not a matter of common knowledge." *Id.* Accordingly, a party seeking a recovery based upon the value of mineral reserves must prove those damages by expert testimony. *Jatex Oil & Gas Expl. L.P. v. Nadel & Gussman Permian, L.L.C.*, 629 S.W.3d 397, 407 (Tex. App.—Eastland 2020, no pet.) (citing *Cty. Mgmt., Inc. v. Butler*, 650 S.W.2d 888, 890 (Tex. App.—Austin 1983, writ dism'd by agr.), *abrogated on other grounds by Coastal Oil & Gas Corp. v. Garza Energy Tr.*, 268 S.W.3d 1 (Tex. 2008)).

Concho responds that Hunter's testimony was admissible and reliable under the Property Owner Rule, which affords a lay witness the ability to provide opinion testimony.

28

*See id.* at 406. "It provides an exception to the requirement that a witness must establish his qualifications to express an opinion on land values. Under the rule, a property owner's testimony fulfills the same role that expert testimony does." *Id.* (citing *Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 157 (Tex. 2012)). However, Texas courts have held that while a property owner is qualified to testify about the value of his property, the Property Owner Rule does not extend to matters "that are of a technical or specialized nature" such as the value of mineral reserves. *See Wortham Bros., Inc. v. Haffner*, 347 S.W.3d 356, 361 (Tex. App.—Eastland 2011, no pet.); *see also Basic Energy Serv., Inc. v. D-S-B Props., Inc.*, 367 S.W.3d 254, 265 (Tex. App.—Tyler 2011, no pet.) ("The value of mineral reserves is not a matter of common knowledge, and therefore it is the plaintiff's burden to prove damages by expert testimony."). Accordingly, as Hunter was not a designated expert, his testimony could not be used to prove the damages of lost profits on the undrilled well. *See Jatex*, 397 S.W.3d at 407–08. With no expert evidence presented on the issue of lost profits, we conclude that the trial court did not err in disregarding the jury's findings as to lost profits. *See Garton*, 190 S.W.3d at 144.

## B. Prejudgment Interest

Concho argues that the trial court erred in failing to include prejudgment interest in the judgment, citing *Johnson & Higgins v. Kenneco Energy, Inc.* for the proposition that "an award of prejudgment interest on past damages is mandatory." 962 S.W.2d 507, 531 (Tex. 1998). Prejudgment interest may be awarded on a breach of contract claim under common law equitable principles; in such a case, prejudgment interest accrues at the rate of postjudgment interest and is computed as simple interest. *See id.* at 532.

29

Damages awarded for breach of contract bear prejudgment interest. "Prejudgment interest is 'compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment.'" *See id.* at 528 (quoting *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 550 (Tex. 1985), *abrogated by id.* at 507)). In *Phillips Petroleum Co. v. Stahl Petroleum Co.*, 569 S.W.2d 480, 485 (Tex. 1978), the supreme court recognized two separate bases for the award of prejudgment interest: (1) an enabling statute; and (2) general principles of equity. Statutory prejudgment interest applies only to judgments in wrongful death, personal injury, property damage, and condemnation cases. TEX. FIN. CODE ANN. §§ 304.102, 304.201; *Johnson & Higgins*, 962 S.W.2d at 530. Here, Concho is entitled to recover on its breach of contract claim. Therefore, any award of prejudgment interest is governed by the common law. *Johnson & Higgins*, 962 S.W.2d at 530; *see Adams v. H & H Meat Products, Inc.*, 41 S.W.3d 762, 780 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.).

For a breach-of-contract claim, prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim, or (2) the date suit is filed. *Johnson & Higgins*, 962 S.W.2d at 532. A claim "is a demand for compensation or an assertion of a right to be paid." *Toshiba Mach. Co., Am. v. SPM Flow Control, Inc.*, 180 S.W.3d 761, 785 (Tex. App.—Fort Worth 2005, pet. granted, judgm't vacated w.r.m.). A claim need not demand an exact amount or list every element of damage. *Id.* Concho added its breach of contract claims to its first amended counterclaim on August 11, 2014. Prejudgment interest began to run from that date. *See Johnson &*

30

*Higgins*, 962 S.W.2d at 532. Prejudgment interest in a breach of contract case is calculated as simple interest and is based on the postjudgment interest rate applicable at the time of judgment. *Siam v. Mountain Vista Builders*, 544 S.W.3d 504, 514 (Tex. App.—El Paso 2018, no pet.) (citing *Johnson & Higgins*, 962 S.W.2d at 532; *De La Morena v. Ingenieria E Maquinaria De Guadalupe, S.A.*, 56 S.W.3d 652, 659 (Tex. App.—Waco 2001, no pet.)). Section 304.003 of the Texas Finance Code provides the applicable rate for calculating postjudgment interest, and we look to that same interest rate in calculating prejudgment interest as well. *See ExxonMobil Corp. v. Valence Op. Co.*, 174 S.W.3d 303, 319–20 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (applying § 304.003 in calculating prejudgment interest in a breach of contract case); *De La Morena*, 56 S.W.3d at 659 (recognizing that the interest rate set forth in § 304.003 of the finance code is the proper rate to use for calculating prejudgment interest rate in breach of contract case); *Tips v. Hartland Devs., Inc.*, 961 S.W.2d 618, 624–25 (Tex. App.—San Antonio 1998, no pet.) (where the parties' contract did not specify an interest rate, court applied § 304.003 in calculating prejudgment interest in a breach of contract case). Further, an appellate court may determine the proper interest rate to be applied under this statute in calculating prejudgment interest and reform a trial court's judgment accordingly. *See Garden Ridge, L.P. v. Clear Lake Ctr., L.P.*, 504 S.W.3d 428, 452–53 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (applying statutory rate of five percent to calculate prejudgment interest owed on judgment in breach of contract case, and reforming judgment accordingly). As such, we conclude that the trial court erred in failing to award prejudgment interest and calculate the prejudgment interest at five percent simple interest. *See* Tex. Fin. Code Ann.

31

§ 304.003.

Prejudgment interest on the trial court's judgment of $1,030, at a five percent simple interest rate for 28 months, totals $120.17. We sustain Concho's second issue as it relates to prejudgment interest and modify the trial court's judgment to include an award of prejudgment interest in that amount.[4]

## C. Declaratory Judgment Attorneys' Fees

Concho next contends that it is entitled to recover its declaratory judgment attorneys' fees, and that the trial court erred in not awarding such fees. The jury awarded $457,520.61 in attorneys' fees "in connection with the defense of [Ellison's] declaratory judgment action and the pursuit of [Concho's] declaratory judgment action." In partially granting Ellison's JNOV motion, the trial court set aside this award for attorneys' fees and rendered final judgment that Concho take nothing in attorneys' fees in connection with the declaratory judgment actions. The trial court issued findings of fact and conclusions of law regarding Concho's request for attorneys' fees under the declaratory judgment actions. Concho challenges those findings and conclusions on appeal.

The Declaratory Judgments Act provides that a trial court may award costs and reasonable attorney's fees when doing so is equitable and just. TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. Because the Act does not require an award of attorney's fees, on appeal we review the trial court's judgment awarding fees for an abuse of discretion. *Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998); *Bank of N.Y. Mellon v. Soniavou Books, L.L.C.*, 403 S.W.3d 900, 907 (Tex. App.—Houston [14th Dist.] 2013, no pet.). A

---

[4] Having overruled Concho's issue related to the award of lost profits damages, we reject its request for prejudgment interest on that award.

trial court abuses its discretion if it misinterprets or misapplies the law or acts arbitrarily or unreasonably. *See Perry Homes v. Cull*, 258 S.W.3d 580, 598 & n.102 (Tex. 2008); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985); *City of Carrollton v. RIHR, Inc.*, 308 S.W.3d 444, 454 (Tex. App.—Dallas 2010, pet. denied).

"[A] party cannot use the [Declaratory Judgments Act] as a vehicle to obtain otherwise impermissible attorney's fees." *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 669 (Tex. 2009). As the supreme court has explained,

> [i]f repleading a claim as a declaratory judgment could justify a fee award, attorney's fees would be available for all parties in all cases. That would repeal not only the American Rule [prohibiting fee awards unless specifically provided by contract or statute] but also the limits imposed on fee awards in other statutes.

*Id.* For these reasons, "fees are not permissible under § 37.009 where [the declaration is sought] solely for the purpose of obtaining attorney's fees." *Kenneth Leventhal & Co. v. Reeves*, 978 S.W.2d 253, 258 (Tex. App.—Houston [14th Dist.] 1998, no pet.); *see City of Carrollton*, 308 S.W.3d at 454 ("It is an abuse of discretion to award attorney's fees . . . when the [Act] is relied upon solely as a vehicle to recover attorney's fees."); *see also Tanglewood Homes Ass'n, Inc. v. Feldman*, 436 S.W.3d 48, 69 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

Here, the trial court concluded, *inter alia*, that "Concho's declaratory-judgment claim is an attempt to recast both its contract claim and its title arguments. Because Texas law does not allow recasting contract claims and title issues as a declaratory-judgment claim, Concho cannot recover attorney's fees under the Texas Declaratory Judgments Act." Concho argues in its cross-appeal that its declaratory judgment claim "was not merely a recasting of its contract claim: the boundary dispute existed whether or not COG

33

had suffered damages from breach of contract." However, after the trial court made its summary judgment rulings, counsel for Concho stated: "[O]ur remaining claims that haven't been dealt with in summary judgment, in addition to what we've discussed with your Honor today, are our breach of contract claim and perhaps malicious prosecution[,] and a Rule 13 issue." Concho also stated:

> This Court has already decided in our favor as to the boundary line issue in our judgment. I'm sure they're gonna disagree with that. Our position is the declaratory judgment actions taken by this Court have already said the boundary line is where we say it is. The boundary line is where the mineral owners have agreed it to be since 1987. That shouldn't have to be litigated with a jury in this case. This court has already decided that.

The issue of attorneys' fees arose in the same hearing and the following exchange took place between counsel:

> Ellison:      Your Honor, one point—you're gonna be reconsidering—you're gonna be reconsidering the reconsideration. The fact that we have the contract claim, . . . but the fact that we have the contract claim, there's either the title claim, which has already been decided, or there is a contract claim—in the hearing records, they say all—all of the declaratory judgment contracts and the title claims all involve the same facts and the same two documents. So[,] in considering the reconsideration of the attorneys' fees issue, there is that case law that says if you have the more limited right to attorneys' fees under contract, which means you would have to win to get attorneys' fees, you can't use the summary judgment.
>
>              So[,] they're caught between it's either a title issue on one hand, or it's a contract issue on the other. And in either case, you either don't get attorneys' fees, or you only get them if you win, and there's nothing left to decide on declaratory judgment, because the Judge didn't decide or interpret any of those other documents. He just said you lose, because you have the signed 2008 letter.
>
> Concho:      Well, with due respect to [counsel for Ellison], we've already won the—call it a title issue, call it a boundary issue is what I

34

call it—we've already won that. That was the summary judgment fight that was decided a year and a half ago, or whatever it was. So, we've already won that.

The attorneys' fees piece that goes with that is the subject of our current conversation with the Court. The breach of contract piece that is left certainly has an attorneys' fee award that would accompany that. We're not entitled to double dip on attorneys' fees, and nobody is trying to do that.

While Concho argues on cross-appeal that the summary judgment did not grant its affirmative claim for declaratory judgment, Concho clearly agreed that the summary judgment resolved the boundary dispute. In October 2014, one month after summary judgment was granted in its favor and against Ellison, Concho sought recovery for attorneys' fees in the declaratory judgment action. Now, however, Concho states that there were "post-summary judgment fees necessary to prosecute [Concho's] affirmative claim for declaratory relief." The declaratory relief sought related to the boundary line, something Concho argued numerous times was resolved when summary judgment was granted. Concho proceeded to trial on its breach of contract claim. The trial court found, and we agree, that "Concho's contract claim and its declaratory claim involve the same set of operative facts (as Concho's counsel admitted on the record). As a result, Concho cannot recover attorney's fees under the Texas Declaratory Judgments Act." The trial court did not err in disregarding the jury's findings as to attorneys' fees under the Act. *See MBM Fin. Corp.*, 292 S.W.3d at 669. We overrule Concho's third issue.

## D.    Appellate Attorneys' Fees

By its fourth issue in its cross-appeal, Concho contends that the trial court erred in failing to disregard the jury's "$0 findings as to appellate fees, and in failing to render

35

judgment for the uncontroverted amounts." A trial court may disregard the jury's negative finding and substitute its own affirmative finding only if the evidence conclusively establishes the affirmative finding. *Brown v. Bank of Galveston, Nat'l Ass'n*, 930 S.W.2d 140, 145 (Tex. App.—Houston [14th Dist.] 1996), *aff'd*, 963 S.W.2d 511, 515–16 (Tex. 1998). The amount of attorneys' fees to be awarded is a question of fact and must be supported by credible evidence; this amount rests in the sound discretion of the trial court and its findings will not be disturbed, absent an abuse of discretion. *A.V.I., Inc. v. Heathington*, 842 S.W.2d 712, 718 (Tex. App.—Amarillo 1992, writ denied); *Travelers Ins. v. Brown*, 750 S.W.2d 916, 918–19 (Tex. App.—Amarillo 1988, writ denied). While the fact finder ordinarily determines the reasonableness of the amount, the decision may not be arbitrary. *Gunter v. Baily*, 808 S.W.2d 163, 166 (Tex. App.—El Paso 1991, no writ). Evidence of attorneys' fees that is clear, direct, and uncontroverted is taken as true as a matter of law, especially when the opposing party has not rebutted the evidence. *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990). Testimony by an interested witness may establish the amount of attorney's fees as a matter of law only if: (1) the testimony could be readily contradicted if untrue; (2) it is clear, direct, and positive; and (3) there are no circumstances tending to discredit or impeach it. *Id.*

Under § 38.001, the trial court has no discretion to deny attorneys' fees when presented with evidence of the same. TEX. CIV. PRAC. & REM. CODE ANN. § 38.001; *Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998); *see also, e.g.*, *Brent v. Field*, 275 S.W.3d 611, 622 (Tex. App.—Amarillo 2008, no pet.) ("Under [§] 38.001, an award of reasonable attorney's fees is mandatory if there is proof of the reasonableness of the

fees. A Court possesses discretion to determine the amount of attorney's fees, but it lacks discretion to deny attorney's fees if they are proper under [§] 38.001."). If trial attorney's fees are mandatory under § 38.001, then appellate attorney's fees are also mandatory when proof of reasonable fees is presented. *See Ventling v. Johnson*, 466 S.W.3d 143, 154 (Tex. 2015) (citing *Gill Sav. Ass'n v. Chair King, Inc.*, 797 S.W.2d 31, 32 (Tex. 1990) (per curiam) (remanding for retrial on appellate attorney's fees under § 38.001 when there was some evidence to support an award); *DaimlerChrysler Motors Co. v. Manuel*, 362 S.W.3d 160, 198–99 (Tex. App.—Fort Worth 2012, no pet.) (holding that if an award of trial attorney's fees is mandatory under § 38.001, then an award of appellate attorney's fees is likewise mandatory)).

Here, the jury awarded $392,479.39 in attorneys' fees attributable to Concho's breach of contract claim against Ellison. The jury, however, awarded $0 in appellate attorneys' fees; Concho requested the trial court set aside that finding and enter a finding in line with the evidence it presented on appellate attorneys' fees. Concho's counsel presented uncontroverted evidence of the appellate attorneys' fees Concho would likely incur for both for an appeal to this Court and for further proceedings in the Texas Supreme Court. We hold that Concho conclusively established its entitlement to an award of conditional appellate attorney's fees under § 38.001. *See Ventling*, 466 S.W.3d at 154; *Brown*, 930 S.W.2d at 145.

An award of appellate attorney's fees must be contingent upon the appellant's unsuccessful appeal. *Picket v. Keen*, 47 S.W.3d 67, 78 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.). To do otherwise would penalize a party for pursuing a meritorious

37

appeal. *Schlueter v. Schlueter*, 975 S.W.2d 584, 590 (Tex. 1998); *Picket*, 47 S.W.3d at 78. Thus, "[a]n appellee may not recover attorney's fees for work performed on any issue of the appeal where the appellant was successful." *Lynch v. Lynch*, 540 S.W.3d 107, 136 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (quoting *Jacks v. G.A. Bobo*, No. 12-10-00163-CV, 2011 WL 2638751, at *5 (Tex. App.—Tyler June 30, 2011, pet. denied) (mem. op.)); *Picket*, 47 S.W.3d at 78. However, an appellee may still recover attorney's fees for work performed on any issue of the appeal where the appellant was unsuccessful. *Smith v. Smith*, 757 S.W.2d 422, 426 (Tex. App.—Dallas 1988, writ denied). If a party is entitled to attorney's fees from the adverse party on one claim but not another, the party claiming attorney's fees must segregate the recoverable fees from the unrecoverable fees. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006). Thus, an appellee must segregate her appellate attorney's fees when the appellant is partially successful in an appeal. *See Smith*, 757 S.W.2d at 426; *see also Robertson v. Robertson*, No. 13-16-00309-CV, 2017 WL 6546005, at *5 (Tex. App.—Corpus Christi–Edinburg Dec. 21, 2017, no pet.) (mem. op.).

Because Concho was successful in defending against Ellison's appeal but only partially successful in its cross-appeal, we reverse the award of no appellate attorneys' fees and remand to the trial court for a determination of the reasonable amount of appellate attorneys' fees to be awarded to Concho given that Concho only was partially successful in its cross-appeal. On remand, Concho must segregate the recoverable fees from the unrecoverable fees. *See Tony Gullo Motors*, 212 S.W.3d at 313.

## IV. CONCLUSION

We reverse the trial court's judgment to the extent that it awards $0 in appellate attorneys' fees and remand to the trial court for a determination of appropriate appellate attorneys' fees. We affirm the remainder of the judgment as modified to include prejudgment interest on Concho's damages claim.

NORA L. LONGORIA
Justice

Delivered and filed on the
15th day of December, 2022.